**J. T. HERNDON, d/b/a Herndon Stock Farm, Appellant,**

v.

**SOUTHERN PEST CONTROL COMPANY, Inc., Appellee.**

No. 8608.

United States Court of Appeals Fourth Circuit.

Argued June 1, 1962.

Decided Aug. 30, 1962.

W. D. Rhoad, Bamberg, S. C. (Kearse, Kemp & Rhoad, Bamberg, S. C., and Murdaugh, Eltztroth & Peters, Hampton, S. C., on brief), for appellant.

T. B. Bryant, Jr., Orangeburg, S. C. (Bryant & Fanning, Orangeburg, S. C., and McRae & McRae, Charlotte, N. C., on brief), for appellee.

Before SOPER and BELL, Circuit Judges, and BARKSDALE, District Judge.

BARKSDALE, District Judge.

■ From a directed verdict for the defendant, Southern Pest Control Company, Inc., a North Carolina corporation, plaintiff, J. T. Herndon, a citizen and resident of South Carolina, has prosecuted this appeal. In this situation, by the well established rule, we must view the evidence in the light most favorable to the plaintiff and give consideration to all reasonable inferences to be drawn from it.

J. T. Herndon, doing business as Herndon Stock Farm, operated a large hog-producing farm in Bamberg County, South Carolina. There were two principal buildings on the farm, an enclosed farrowing house, 240 feet long, consisting of farrowing pens, and larger pens in which the sows and their pigs were kept until the pigs were approximately six weeks old. Then the sows and pigs were moved to a building about a half mile away consisting of finishing pens, or "pig parlors", as they were euphemistically called. There the pigs were kept until they were ready for market at six months old. This building was only about half enclosed. Customarily, there were some 1,700 to 1,800 pigs in these two buildings. The male hogs and sows to be bred, or in gestation, were kept in open pens fifty feet or more from either of the buildings.

On April 10, 1959, an agent of Southern Pest Control, Inc., called on Mr. Herndon at the farm for the purpose of selling him an insecticide called "Fog-Tox", and a machine for dispensing it, representing to Herndon that the Fog-Tox dispensed by this machine would kill flies without harming the pigs. The machine was equipped with a gasoline motor designed to heat a mixture of fuel oil and the insecticide and expel the mixture as a fog into the atmosphere. The agent represented himself to be an expert in the use of insecticides around livestock, and assured Herndon that, used as directed, the insecticide would kill flies, but would not be harmful to the pigs. The agent explained the method of mixing the insecticide with fuel oil, and gave a demonstration of how to use the machine. Being pleased with the lethal effect of the fog on flies, and being assured that it would not be harmful to his pigs, Herndon purchased the machine and ten gallons of Fog-Tox, and from then on proceeded to use it daily both in the farrowing house and finishing pens. On April 19, 1959, Herndon purchased an additional five gallons of Fog-Tox.

When Herndon purchased the Fog-Tox on April 10, 1959, his pigs were in good condition and healthy. His experience had been that, in the normal course of events, approximately one percent of his pigs would die from natural causes in the course of a year, that is, some forty or fifty pigs in a year's time. In February 1959, Herndon had lost approximately sixty-five pigs from the disease, Transmissible Gastro Enteritis, commonly known as "TGE". While this disease had been prevalent throughout his entire stock in February 1959, it was only fatal to little pigs, less than two weeks old, and all pigs which recovered from it developed an immunity thereafter. Its symptoms were easily recognizable. However, by the middle of March, the TGE had been eradicated, and there was no trouble from it thereafter.

When Herndon and his employees began to use the Fog-Tox and dispensing machine purchased from Southern Pest Control Company, the Fog-Tox and fuel oil were mixed and the machine used as directed by Southern Pest Control's agent. Within six to eight days after the use of the Fog-Tox had begun, Herndon's manager observed that the pigs in

the farrowing house and finishing pens showed alarming symptoms and seemed sick. By April 20, 1959, pigs began to die. Between that date and June 1st, 238 hogs and pigs died. None of the sick pigs showed any symptoms of TGE. The pigs which became sick, but did not die, were stunted and required an additional thirty days of feeding before reaching marketable size. The hogs in the open pens during the use of the Fog-Tox in the two buildings, were not affected at all, but remained healthy. When Herndon's veterinarian saw the pigs on May 15, 1959, and learned of the use of the Fog-Tox, he directed that its use be stopped immediately, and it was stopped. After the use of the Fog-Tox had been stopped, most of the sick hogs gradually recovered, the last death occurring on June 1, 1959. Herndon's veterinarian, who had attended Clemson College three years and graduated from Kansas State University with the degree of Doctor of Veterinary Medicine, and was licensed as a veterinarian in South Carolina, after performing fifty autopsies on the pigs, gave as his definite opinion that Herndon's hogs and pigs which died during the period April 10, 1959 to June 1, 1959, "died from the continued inhalation of the mixture of this insecticide or pesticide combined with fuel oil".

Subsequently, Herndon instituted this action seeking to recover from Southern Pest Control the damages which he alleged he had sustained resulting from its breach of warranty. At the conclusion of plaintiff's evidence, the District Judge directed a verdict for the defendant.

■ There is clear and positive evidence that, during the conversation between Southern Pest Control's agent and Herndon, which resulted in the sale of the Fog-Tox and dispensing machine, in answer to Herndon's inquiry, Southern Pest Control's agent told Herndon that the Fog-Tox was not at all harmful to his pigs, and assured him that it would not damage them at all. The inference is inescapable that Herndon relied on this assurance in making his purchase and that the representation was so intended.

In the evidence now before us, there being no denial that this representation was made, we hold that this representation constituted an express warranty.

"A warranty is a statement or representation made by the seller of goods, contemporaneously with and as a part of the contract of sale, having reference to the character, quality, kind, variety, or title of the goods. A warranty is express when the seller makes an affirmation with respect to the article to be sold, pending the contract of sale, upon which it is intended that the buyer shall rely in making the purchase." Stevenson v. B. B. Kirkland Seed Co., 176 S.C. 345, 180 S.E. 197, 200.

See also Joseph v. Sears Roebuck & Co., 224 S.C. 105, 77 S.E.2d 583; 40 A.L.R.2d 742.

■ It is hornbook law that an action lies in behalf of the buyer against the seller for damages resulting from the breach of an express warranty.

"The obligation arising under a warranty is that of an undertaking or promise that the goods shall be as represented or, more specifically, a contract of indemnity against loss by reason of defects therein." 77 C.J.S. Sales § 302d, p. 1119.

See also Joseph v. Sears Roebuck & Co., supra.

■ Therefore, it follows that, if Herndon's evidence was sufficient to make out a prima facie case of breach of warranty, and that this breach resulted in loss to him, at least he was entitled to go to the jury, no matter what defendants' evidence might have been. It is our conclusion that Herndon's evidence was sufficient for these purposes, and that the District Court was in error in directing a verdict for the defendant.

In directing a verdict for the defendant, the District Court relied upon Thomas v. Kasco Mills, Inc., 4 Cir., 1955 (S.C.), 218 F.2d 256, and Ralston Purina Company v. J. S. Edmunds et al., 4 Cir., 1957 (S.C.), 241 F.2d 164. Each of these cases involved the question of the lia-

bility of a manufacturer of turkey feed for damages resulting from the alleged breach of an implied warranty that the feed was fit for its intended purposes. In each case this court recognized that an action would lie in favor of a buyer against a seller for breach of an implied warranty of fitness if the proof was sufficient to show a breach and to establish that damages had resulted from such breach. It is true that, in the Kasco case, this court affirmed the action of the District Judge in directing a verdict against the buyer of the turkey feed, and in the Ralston Purina case, this court reversed the action of the District Court in approving the verdict of the jury assessing damages for breach of warranty against the seller of the turkey feed, and remanded the case for entry of judgment for the seller against the buyer. However, the decision of this court in neither case constituted a holding that a buyer might not recover of the seller damages resulting from a breach of warranty. In each of the cases, the basis of the decision of this court was the insufficiency of the proof to establish that the implied warranty had been breached and that plaintiff had been damaged by such a breach. In both cases, the turkey growers adduced evidence that, during the time that they were using the turkey feed complained of, they had experienced difficulties and suffered losses in their breeding program and turkey production. However, in each case, this court held that the proof adduced by the turkey growers was insufficient to make out a prima facie case that the turkey growers' troubles resulted from the use of the turkey feed complained of.

In the Kasco case, this court said (218 F.2d p. 258):

"The evidence of unusual losses was in itself insufficient, for there were many conditions other than food which affected the productivity and growth of the flocks; and the expert testimony was too uncertain to supply the missing link. * * *

"When the uncertainty of all the evidence is considered with the additional fact that the defendant, a grower of long experience, continued to use the feed for a period of more than two years, and only raised the defense after the Kasco Company had declined further shipments, it is clear that there was no error in directing a verdict for the amount of the plaintiff's claim."

(The seller had sued for unpaid balance of account, and the buyer had alleged breach of warranty as a defense.)

In the Ralston Purina case, this court said:

"Alternative possibilities as to the cause of an event are not enough where the defendant is liable under one and not under the others and where no basis for a rational choice among the alternatives is provided. They invite sheer conjecture and speculation and hence raise no question for the jury. * * *" (241 F.2d p. 167)

"Evidence which shows a 'probability' and not a mere 'possibility' is especially necessary in a case such as this, where expert testimony is heavily relied upon to prove that one event was the proximate cause of another. * * *" (241 F.2d p. 168).

"Taking plaintiffs' evidence as a whole, his witnesses merely showed that the 'egg-bound' condition, prolax and culls, could have been due to one or more of a number of causes, such as tension resulting from the feed change or anything else in the turkeys' surroundings to which they objected, disease, or pushing them too hard for production by excessive lighting at too young an age. * * *" (241 F.2d p. 169).

"Viewing plaintiffs' evidence in its entirety, it appears that their witnesses disclosed other equally plausible explanations for plaintiffs' breeding difficulties in addition to the change of feed; and they failed to show a greater probability that

the feed, rather than other causes, was at fault." (241 F.2d p. 170).

These two cases, Kasco and Ralston Purina, are clearly distinguishable from the instant case, and we hold that the District Judge was in error in considering them controlling and that they required him to direct a verdict for the defendant Southern Pest Control Company.

It is true that in February 1959, Herndon had suffered losses from an epidemic of TGE, but the evidence clearly showed that this epidemic had cleared up by the middle of March, that pigs which had had this disease developed an immunity to it, that its symptoms were clearly recognizable, and that Herndon's pigs had been free from it for nearly a month before the use of Fog-Tox began.

Also, on cross examination of Herndon's veterinarian, it appeared that another veterinarian, who did not testify in the case, had reported, after an autopsy, that the one pig autopsied by him had Salmonellosis. It appears from the evidence that Salmonellosis is due to an organism generally found in hogs that have enteritis infections, a secondary infection. It is a very common organism likely to be found present in ninety percent of hogs tested. Neither that veterinarian, nor anyone else, testified that the abnormal number of deaths among Herndon's pigs resulted from Salmonellosis. Although Herndon's evidence was not entirely clear as to the precise dates of the deaths of his pigs, nevertheless there was definite and uncontradicted evidence that more than 200 of Herndon's hogs and pigs died between April 10, 1959 and June 1, 1959, the period during which the Fog-Tox was used, although they were healthy and in good condition at the beginning of that period. A thoroughly qualified veterinarian, after numerous visits and fifty autopsies, expressed the definite opinion that the deaths resulted from inhalation of the mixture of Fog-Tox and fuel oil which had been used as directed by Southern Pest Control's agent.

It is our conclusion that plaintiff's evidence made out a case for the jury and the District Judge's direction of a verdict for the defendant was erroneous. The judgment of the District Court will be reversed and the case remanded for a new trial not inconsistent with this opinion.

Reversed and remanded.