T. M. THOMAS, Trading as Thomas Turkey Ranch and Hatchery, Appellant,

v.

KASCO MILLS, Inc., Appellee.

No. 6834.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 8, 1954.

Decided Jan. 5, 1955.

Robert M. Ward, Rock Hill, S. C., and James L. Moss, Jr., York, S. C., for appellant.

Herbert S. Falk, Greensboro, N. C. (Falk, Carruthers & Roth, Greensboro, N. C., Vernon E. Sumwalt and Roddey & Sumwalt, Rock Hill, S. C., on the brief), for appellee.

Before SOPER and DOBIE, Circuit Judges, and HOFFMAN, District Judge.

SOPER, Circuit Judge.

Kasco Mills, an Ohio corporation, engaged in the manufacture and sale of turkey feeds, instituted this action to collect the unpaid balance of an account for goods sold to R. M. Thomas, a citizen of South Carolina, trading as Thomas Turkey Ranch and Hatchery. There was no dispute as to the amount due and owing, if the goods measured up to the proper standards; the defense was that there had been a breach of an implied warranty of fitness in that the merchandise did not constitute a complete feed for turkeys as agents of the plaintiff had represented to the defendant. A counterclaim for damages suffered because of the quality of the food was filed by the defendant. At the conclusion of the evidence Kasco moved for a directed verdict in its favor on its claim and a non-suit on the counterclaim. The judge granted these motions and rendered judgment for the plaintiff in the sum of $29,818.04.

Thomas had had 36 years experience as a turkey breeder, and was the largest grower in his part of the country. When the shipments of feed began in March, 1951 he carried on breeding operations at Myrtle Beach, South Carolina, on the site of an airport formerly used by the United States, and also on a farm at Clover, South Carolina. The conditions at Myrtle Beach were much less favorable for the growing of turkeys than those at Clover, particularly as there was available at Clover a supply of clo-

ver which with buttermilk was used to supplement the turkey feed. The soil at Myrtle Beach was sandy and not suitable for growing clover and the turkeys were raised entirely on the Kasco feed furnished by the plaintiff corporation. There was evidence tending to show that the plaintiff corporation had represented its product as a sufficient food for the turkeys; but nevertheless Thomas supplemented the product at Clover, and testified that it was common practice among growers to supplement commercial feeds and to graze the birds on green fields of clover or something of that kind, and that he followed this method when it was possible for him to do so. He also testified that it was common practice for breeders to use oats and rye for supplemental food.

The transactions between the parties began in March, 1951 and ended in July, 1953 when further shipments were refused by the plaintiff because of Thomas' failure to make prompt payment of his account, which then showed a large debit balance.

In order to establish his defense Thomas offered evidence of unsatisfactory results in the production of eggs and poults in 1951 and 1952, when he was using the Kasco feed, and in addition he offered the testimony of experts who examined certain of the birds in 1953 and found a diseased condition which might be attributed to a deficiency of vitamin E in the Kasco feed used in raising the flocks.

Thomas began using Kasco feed at the end of March, 1951. There was then a laying flock at Myrtle Beach. The first turkeys to be fed on Kasco for a substantial period of time began laying in October, 1951. They had been raised on Kasco feed for several months. The record shows that the hens at Myrtle Beach averaged only 30 eggs each while the normal expectancy would have been 60 to 65 apiece. Subsequently in 1952 the eggs, which had been hatched, proved unsatisfactory in that 160,000 eggs showed a loss of 78,600, whereas the normal loss would have been approximately 40,000.

Additional abnormal losses occurred in 1952 when 70,100 poults hatched were put in brooders and only 42,100 were taken out, whereas the loss should not have exceeded 10 per cent.

The evidence shows, however, that despite these unsatisfactory results Thomas continued to buy the Kasco product until July of 1953 when the Company refused to make further deliveries. Furthermore, during this period he made no complaint to the company as to the quality of the goods. During the same period Thomas received a number of complaints from customers and made certain adjustments and gave them certain credits on their accounts, thereby recognizing the defective character of the goods which he furnished. His only explanation of continuing to purchase the food during this period is that he was told from time to time by representatives of the company that the quality of these goods would be improved.

The evidence indicated that unsatisfactory results in growing turkeys may flow from a number of causes other than improper food; and in order to identify the cause in this case Thomas offered the testimony of Dr. B. W. Bierer, Assistant State Veterinarian in charge of the Diagnostic Laboratory at Clemson College, Livestock Sanitary Department. His evidence showed that at the end of August 1953 he made a clinical examination of nine poults which had been sold by Thomas to one of his customers, and made a diagnosis of air sac infection and nutritional myopathy. He testified that the first mentioned disease could come from pullorum or from fowl typhoid, para typhoid, or Newcastle's disease, and a vitamin A deficiency, but he found no pullorum or typhoid. He also testified that nutritional myopathy is a vitamin E deficiency which in his opinion was probably due to a lack of vitamin E in the feed furnished to the turkeys. He admitted that he had no knowledge of the conditions under which the eggs had been hatched or the poults had been raised, and he conceded that there were other possible causes for the condition of

the poults, including improper feeding practices, extremely hot weather, poor health and improperly stored feeds.

Dr. Jos. C. Jones, a bacteriologist connected with the Department of Agriculture of the State of North Carolina, also gave testimony for the plaintiff. He examined the same nine poults and made the same diagnosis as Dr. Bierer, so far as the diseases were concerned. He was, however, unwilling to go further and testify that the condition of the fowls was probably due to a food deficiency and confined himself to saying that the condition was possibly due to the quality of the food; and he added that there were other definite possibilities that he would not exclude.

The counterclaim depends on the same evidence as the defense insofar as it relates to the losses in eggs and poults which occurred in 1951 and 1952. It is conceded that there was no evidence of probative force to sustain the counterclaim insofar as it related to the payment of monies by Thomas in adjustment of his customers' complaints.

■ The judge held that the evidence did not furnish substantial basis for a finding that the troubles with the turkeys were caused by Kasco feed. We are in accord with this conclusion. The evidence of unusual losses was in itself insufficient, for there were many conditions other than food which affected the productivity and growth of the flocks; and the expert testimony was too uncertain to supply the missing link. It is noteworthy that the losses of which the defendant complains occurred in 1951 and 1952 and that the birds which were found to be diseased were not hatched and examined until August, 1953, and that they came from breeders which were fed on merchandise delivered in 1953. There was no examination of the fowl which were fed on Kasco during 1951 and 1952 when the losses occurred; and it was not shown that the feed in both periods was identical. Moreover, the diagnosis made in 1953 showed that the birds were suffering from air sac infection, and no evidence was offered to connect this disease with a food deficiency or otherwise to explain the origin or effect of the disease on the productivity of the birds. For these reasons the expert testimony lacks probative force. When the uncertainty of all the evidence is considered with the additional fact that the defendant, a grower of long experience, continued to use the feed for a period of more than two years, and only raised the defense after the Kasco Company had declined further shipments, it is clear that there was no error in directing a verdict for the amount of the plaintiff's claim. It is well settled that if the evidence as to a fact is so slight as to furnish only basis for a conjecture, the existence of the fact should not be submitted to the jury. See Poovey v. International Sugar Feed Number Two Co., 191 N.C. 722, 726, 133 S.E. 12; Magnolia Milling Co. v. Clark, 128 Wash. 677, 223 P. 1042.

Affirmed.