**RALSTON PURINA COMPANY,**
Appellant,

v.

**J. S. EDMUNDS, J. L. Edmunds and J. W. Edmunds,** co-partners doing business as **J. S. Edmunds and Sons,** Appellees.

**No. 7289.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 21, 1956.

Decided Jan. 25, 1957.

David W. Robinson, Columbia, S. C. (C. W. F. Spencer, Jr., Rock Hill, S. C., and Robinson, McFadden & Dreher, Columbia, S. C., on the brief), for appellant.

Augustus T. Graydon and C. T. Graydon, Columbia, S. C. (W. Gist Finley, York, S. C., on the brief), for appellees.

Before SOPER and SOBELOFF, Circuit Judges, and THOMSEN, District Judge.

SOBELOFF, Circuit Judge.

This is a controversy between turkey breeders and a manufacturer of turkey feed, in which the former claim that a turkey malady which hampered their breeding operations in 1955 was due to a change in the manufacturer's feed of which the plaintiffs were not forewarned. Since the appeal poses the question of sufficiency of the evidence to raise an issue for the jury, a somewhat detailed recital of the facts adduced by the plaintiffs is necessary.

J. S. Edmunds and Sons, who were the plaintiffs below and are the appellees here, have been engaged in the turkey-raising business at Clover, South Carolina, for twenty-five years. Their method of operation is to purchase turkeys for breeding purposes, usually share cropping them to experienced turkey farmers. They maintain a hatchery for the eggs produced and then either sell the poults to other turkey growers or raise the young turkeys themselves. In addition, plaintiffs maintain a plant in which turkeys are processed for consumption by the public.

Ralston-Purina Company, defendant-appellant, manufactures and sells feed and supplies for turkeys and other farm animals. Before the present controversy, Edmunds used Purina products exclusively in their own breeding program and sold turkey feed and supplies in the Clover area under a Purina dealership.

The relevant background facts have their origin in 1954, when, for the first time, Edmunds had a flock of "Berryman broad-breasted bronze" turkeys, a turkey strain purported to be of high breeding quality. These turkeys had been share cropped with a farmer named Penley, and his flock that year had the best production record ever achieved by any of Edmunds' turkey farmers. Attributing Penley's success to the lineage of the turkeys and hoping that all of the plaintiffs' share croppers might duplicate his performance the following year, plaintiffs, on December 14, 1954, purchased 2500 hens and 250 toms 24 to 26 weeks old, of the same strain, from the Berryman farm in Winchester, Kentucky. The turkeys were brought to Clover the next day and were distributed to Edmunds' three share croppers: Penley, Lawrence, and Hammond.

Upon arrival the turkeys were vaccinated against fowl pox, and blood samples were taken and sent to the Clemson College Livestock Laboratory. Results of the tests indicated that twenty-three turkeys had either a positive or suspicious reaction to Salmonella Typhimurium, a disease which makes turkeys unsuitable for breeding purposes. Though the twenty-three diseased or suspected turkeys were killed when the laboratory report reached Clover, the condemned turkeys had mingled with the others in the interim. Another 150 blood samples, taken at the same time as the others, were spoiled and could not be analyzed; the samples were never replaced, and there is no certainty as to the actual condition of the fowl from which these samples were taken.

Another circumstance to be noted is that upon arrival at Clover, South Carolina, the toms were immediately placed under artificial lights during the night time, and the hens were lighted about a week later. Such a procedure is designed to stimulate egg production.

As plaintiffs were under contract to purchase Purina feed exclusively, the turkeys were immediately taken off their diet at Berryman's (Red Comb feed plus grain) and put on Purina *Growing* Chow, a complete feed not required to be supplemented by grain. This diet, however, was not long continued, inas-

much as mating and production were not far off, and the menu was again changed, on December 22, to Purina *Breeding Chow* supplemented by oats. This was a feed manufactured in pellet form, each pellet being 3/16-inch in diameter. The pellet, made according to a Purina formula, contained various ingredients and apparently had been an acceptable and successful turkey feed.

For some time, Purina had planned to reduce the size of this pellet from 3/16-inch to 5/32-inch, the apparent reason for the change being the advantage that would accrue from employing the same size dies for turkey feed pellets and chicken feed pellets. Plaintiffs, however, were never informed of this prospective alteration in size, and after the change Purina continued its usual feed shipments to plaintiffs.

While the change in size is undisputed, the plaintiffs also claimed (and the defendant denied) that the new pellets were different in color and harder in texture than the 3/16-inch pellets. There is no evidence of change in the formula.

The exact date on which the new pellets were put in Edmunds' turkey troughs is not certain, but it was testified by Penley that on or about January 4, 1955, his flock was "hollering" and refusing to eat. It was then, Penley says, that he noticed the smaller pellet in the trough. This according to plaintiffs' evidence, was the first that Edmunds or their share croppers knew of the change. At about this time, Penley testified, he also noticed that the turkeys' droppings were loose and white. Hammond and Lawrence, two of Edmunds' share croppers, testified that they discovered the smaller pellet on January 6 and January 12, respectively, and that their flocks slacked off in feed consumption, hollered, and had white droppings.

The turkeys went into egg production in the middle of January, but without the success that plaintiffs had hoped for. The plaintiffs introduced evidence to show that fewer eggs were produced than had been anticipated; that the percentage of poults hatched from the eggs produced fell below expectations, and that there were more than the usual number of inferior eggs unfit for hatching. These, known in the industry as "culls," consisted of cracked, odd-shaped, soft-shelled, and "pee-wee" eggs. In addition, there was evidence that an unusual number of turkeys suffered prolapses, known in the trade as "blowouts." A prolapse occurs when a hen turkey, in passing an egg, turns her oviduct inside out, causing it to protrude from her body. Autopsies performed on Edmunds' turkeys indicated that this was due to an "egg-bound" condition in which the egg clings to the interior walls of the oviduct, and when the hen attempts to pass the egg, the oviduct passes with it. The autopsies also indicated that, due to the exposure of the oviduct, the prolapsed hens suffered from peritonitis.

Claiming that these difficulties stemmed from the change in Purina's Breeding Chow, Edmunds brought suit for the loss of anticipated profits in their 1955 operations.

The basis of the action is either in the implied warranty that the feed was fit for its intended purpose, or in a claimed promise to plaintiffs in February, 1955, by Purina's southern sales manager, that if Edmunds would continue to use Purina's new pellets until the source of Edmunds' troubles was ascertained, Purina would guarantee all losses if the pellets were found to be at fault.

At the trial plaintiffs produced detailed calculations of their claim, which was essentially the difference between their actual production record and the production anticipated for 1955, based on the 1954 experience of Penley with Berryman turkeys. The alleged damages also included the loss of profits from feed sales to other farmers to whom plaintiffs would have sold poults if hatched. Farmers in the general vicinity of Clover, who had bought Edmunds' poults in the past, tended to buy feed from Edmunds. Also included in the estimate of damages were profits from Edmunds' processing plant,

the operations of which were said to have been reduced by the failure of the turkey crop.

At the conclusion of the evidence, the defendant's motion for a directed verdict was denied and the case was submitted to the jury, which returned a verdict of $40,000.00 for the plaintiffs. On defendant's motion for judgment on its counterclaim of $47,831.02 (an agreed figure), due Purina by Edmunds on prior accounts, the Court deducted the $40,000.00 verdict and entered judgment for the defendant for the difference of $7,831.02, with seven percent interest from May 1, 1955, and five percent attorney's fees.

Defendant Purina appeals, several grounds of reversal being urged. We lay aside all but one, which we think requires reversal, namely, the denial of the motion for a directed verdict.

 Viewing the plaintiffs' evidence, including all reasonable inferences therefrom, in the most favorable light, as is required on a motion for a directed verdict, we assume, for the purposes of this opinion, that the evidence indicated two basic facts: first, that there had been some change in the Purina Breeder chow pellet; and, second, that plaintiffs experienced serious difficulties in their breeding program, with many turkeys suffering from an "egg-bound" condition and prolapse. In our opinion, however, the causal relationship between these two facts, which it was incumbent upon plaintiffs to establish in order to recover, is not proved with the requisite certainty. The existence of such relationship was the crucial issue in determining whether or not plaintiffs presented a case requiring submission to the jury. Unless there was sufficient evidence which, if believed, showed that the change in the Purina pellet was the efficient cause of the production difficulties experienced with Edmunds' flocks, the plaintiffs may not recover. It must be remembered that the question to be resolved is "not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict

* * *." Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720.

Plaintiff's evidence appears to proceed upon three alternative theories of proximate cause: (1) that the trouble was caused by a nutritional deficiency in the new pellet; (2) that changes in the pellet, such as size, color, smell, or hardness, regardless of their nutritional quality, had an adverse psychological effect upon the turkeys which caused them to stop eating and, therefore, to suffer from insufficient nourishment; or (3) that regardless of whether the new pellets affected the turkeys' nourishment, the mere psychological effect of changing the pellet was to upset the birds and directly to disturb their reproduction processes. While it is not clear upon which of these alternative theories plaintiffs place chief reliance, or whether their case rests upon a combination of the three to create the required measure of proof, we think that as to each separately or all together, there was insufficient evidence to create a jury question.

 In attempting to show that the change in the pellet was the source of the turkeys' malady, plaintiffs produced considerable expert testimony, which failed, however, to show a *probable* relationship between the claimed cause and the result complained of. It was effective, at most, to indicate that under each of the three alternative theories, there was a *possibility* that the feed *could* have caused the trouble. Furthermore, the testimony of plaintiffs' own experts indicated other possible causes, disease and excessive lighting, which are not negatived and for which the defendant would not be liable. Alternative possibilities as to the cause of an event are not enough where the defendant is liable under one and not under the others and where no basis for a rational choice among the alternatives is provided. They invite sheer conjecture and speculation and hence raise no question for the jury. Atlantic Coast Line Railroad Co. v. Collins, 4 Cir., 235 F.2d 805. Thomas v. Kasco Mills, 4 Cir., 218 F.2d 256; Henry H. Cross Co. v. Simmons, 8 Cir., 96 F.2d 482, 486; Stano-

**168**

lind Oil & Gas Co. v. Kimmell, 10 Cir., 68 F.2d 520, 522. "It is not sufficient to show a set of circumstances bringing the theory of appellants within the realm of possibilities, nor can the theory itself furnish the deficiency; the evidence must bring the theory to the level and dignity of a probable cause. Gunning v. Cooley, supra;" Franklin v. Skelly Oil Co., 10 Cir., 141 F.2d 568, 570–571, 153 A.L.R. 156. See also United States v. Crume, 5 Cir., 54 F.2d 556. 558; Love v. New York Life Insurance Co., 5 Cir., 64 F.2d 829, 832.

■ Evidence which shows a "probability" and not a mere "possibility" is especially necessary in a case such as this, where expert testimony is heavily relied upon to prove that one event was the proximate cause of another. Bearman v. Prudential Insurance Co. of America, 10 Cir., 186 F.2d 662; Windham v. City of Florence, 221 S.C. 350, 70 S.E. 2d 553; and cases there cited.

■ Although the plaintiffs' first theory of proximate cause hinges upon the important factor of a nutritional deficiency in the $\frac{5}{32}$-inch pellet, the plaintiffs adduced no evidence of such deficiency in the new pellets. Indeed, such evidence as they did offer on this point is to the contrary. Tests which Edmunds caused to be made upon the pellets by Hahn Laboratories and the State Laboratory at Columbia showed that the feed was up to specifications. Plaintiffs sought to diminish the adverse force of this evidence, on the ground that the tests were made upon a second batch of pellets after defendant had taken the first batch back to the factory to be tested; but the fact remains that no testimony is to be found in the record to warrant a finding that the formula of the $\frac{5}{32}$-inch pellets was in any substantial respect different from that of the $\frac{3}{16}$-inch pellet. The nearest that plaintiffs' experts came to providing a basis for such a finding was in answer to a hypothetical question predicated on the hypothesis that all other conditions were satisfactory and that there was no evidence of disease or adverse lighting conditions. Making the assumptions as

directed, the witnesses said that under such circumstances, they would be led to believe that refusal to eat the feed was due to its nutritional deficiency or its unacceptability to the turkeys. Inasmuch as there was evidence of disease and unfavorable lighting conditions, the answer elicited by the hypothetical question is of little value in establishing nutritional deficiency as the source of the turkeys' disorders. If one assumes, as the witnesses were required to assume, that all other factors were satisfactory, focusing attention upon the pellet alone, no other answer could reasonably have been expected. At most, the witnesses' answer could be said to suggest that the feed was a possible cause. This does not advance the plaintiffs' case sufficiently, for the jury may not be permitted to guess between competing possibilities.

That the turkeys suffered from a lack of nourishment was a salient factor of both the first and second theories of proximate cause, stemming in the first theory from a nutritional deficiency in the pellet itself and in the second, from the turkeys' refusal to eat it. No substantial evidence was produced, however, diagnosing such a condition in the turkeys. To the contrary, in fact, was the testimony of one of plaintiffs' key witnesses, Dr. Bierer, that he had found no clinical evidence of nutritional deficiency in the turkeys that he tested; and Dr. Naber, another of plaintiffs' experts, testified that his research indicated no nutritional factors that would produce the condition from which the plaintiffs' flocks suffered. These statements greatly detract even from the possibility, let alone probability, of the theory plaintiffs advance.

Under the plaintiffs' second theory of causation, the turkeys rejected the smaller pellet and stopped eating. Even on this fact, which is basic to the theory, the plaintiffs' evidence was inconsistent and contradictory. Though Penley and Hammond testified that the turkeys would not eat the new pellet, the feed consumption chart kept by plaintiffs and introduced into evidence by them reveals that the turkeys ate more pellets than grain;

and two of the plaintiffs' experts, Drs. Morgan and Naber, corroborate this interpretation of the chart. Inasmuch as the diet of pellets and grain was to have been in equal balance, the inference is open that the grain contained some toxic element or contaminant repulsive to the birds. Indeed, Dr. Naber agreed that the data indicated that the feed did not cause the difficulties unless there was some toxic material contained in it, and this he admitted could have come from the oats, grain, or pellets. While tests performed at plaintiffs' instance on Purina's feed failed to disclose the presence of any contaminant, no such analyses were ever made by plaintiffs on the grain or oats, or on the whey and phenothiazine given the turkeys in early January.

A circumstance upon which plaintiffs place some reliance is that the Penley turkeys improved when they were changed from the Purina feed to Full-O-Pep, a Quaker Oats Company product. But the testimony of plaintiffs' witnesses in this respect was weak and contradictory. Indeed, the witness Bodie, plaintiffs' office manager, admitted on cross-examination that even though the early settings are usually of a low hatchability percentage, the eggs produced by Penley's flock in its third and fourth settings, while on Purina's $\frac{5}{32}$-inch pellet, had a higher hatchability rate than those of the next succeeding setting, which were produced while the flock was being fed the other product.

Regarding the asserted psychological effect, there was testimony in plaintiffs' behalf that turkeys are high-strung birds and that feed changes may upset them. There was, however, no substantial evidence that the turkeys' disorders were likely to have resulted from the psychological effect of the feed change. On the contrary, plaintiffs' own witnesses indicated that the change in the pellet would not have an adverse effect. Dr. Naber testified that the hardness would have no effect on the turkeys' acceptance of the feed; Dr. Richey said he did not think the size would cause the trouble,

and Mr. Mathis said there was no significant change in color; while Dr. Naber was merely able to say that the color of the pellet *might* affect the turkeys' acceptance, which goes no further than to show a bare possibility. Taking plaintiffs' evidence as a whole, his witnesses merely showed that the "egg-bound" condition, prolapse, and "culls" could have been due to one or more of a number of causes, such as tension resulting from the feed change or anything else in the turkeys' surroundings to which they objected; disease, or pushing them too hard for production by excessive lighting at too young an age. That there was any greater probability that the condition resulted from the feed, so as to provide the jury with a basis for rational choice between the alternatives, was not, however, substantially revealed by plaintiffs' own experts. On the negative side Dr. Naber in particular was reluctant to say whether the condition might be due to the change in feed; and in answer to a hypothetical question propounded on cross-examination, which instructed him to assume that the feed was without contaminant and up to specifications regarding ingredients with the only change being in size, and to consider the evidence of disease in the case, he said that the feed probably had very little to do with the condition of plaintiffs' turkeys.

As to lighting, one of the possible causes revealed by plaintiffs' evidence, the testimony of their witness Mathis is noteworthy. He testified that thirty weeks was the recommended age for lighting, while plaintiffs' turkeys were put under twenty-four-hour lights at twenty-four to twenty-six weeks of age. It was said by Mr. Berryman, another Edmunds witness, that these turkeys went into production six weeks earlier than they would normally, and that this was accomplished only by lighting. While plaintiffs' witnesses refrained from expressing definite views as to how much lighting would be excessive, though they recognize that excessive lighting could be harmful, we know that the plaintiffs' turkeys were put on a twenty-

four-hour lighting schedule. If this program was not excessive, none could be.

The alternative possibility that the turkeys' malady might be attributable to disease was suggested by plaintiffs' own witnesses. Not only did they testify as a general proposition that prolapse and "culls" could be due to disease, but they indicated its possibility in this particular case. Dr. Bierer examined the blood samples taken on December 15 prior to the use of the defendant's new pellet, and his report showed twenty-three turkeys with a positive or suspicious reaction to Salmonella Typhimurium, which, as earlier stated, makes turkeys unfit for production. In a later diagnosis of three turkeys, after the troubles had begun, he suspected one of having Newcastle disease, a serious turkey ailment; and in another autopsy of one turkey he found a germ resembling Avicida Pasteurella, which causes fowl cholera. On the witness stand, Dr. Bierer declared categorically that soft-shell eggs were symptomatic of a number of diseases, especially of Newcastle. Drs. Richey and Risher, also called by the plaintiffs, testified similarly, though not as emphatically.

Viewing plaintiffs' evidence in its entirety, it appears that their witnesses disclosed other equally plausible explanations for plaintiffs' breeding difficulties in addition to the change in feed; and they failed to show a greater probability that the feed, rather than other causes, was at fault. As said by Judge Soper in Thomas v. Kasco Mills, supra, 218 F.2d at page 258, in language appropriate to this case, "The evidence of unusual losses was in itself insufficient, for there were many conditions other than food which affected the productivity and growth of the flocks; and the expert testimony was too uncertain to supply the missing link." As the defendant would not be liable for any of these other causes, which were beyond its control, we conclude that the defendant's motion for directed verdict should have been granted.

We are not inadvertent to the salutary doctrine repeated in recent Supreme Court decisions, Tennant v. Peoria & P. U. Railway Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L. Ed. 497, that where the evidence supports conflicting inferences, the question is for the jury. We think, however, that these cases are distinguishable, for there is a lack here of substantial evidence to support the inference on which the plaintiffs rely. See also Kyle v. Swift & Co., 4 Cir., 229 F.2d 887, where the plaintiffs' experts eliminated other possible causes, the opposite of the situation here.

Reversed and remanded for entry of judgment for defendant, in accordance with the views herein expressed.

Reversed and remanded.