Ladonna HARRISON, Plaintiff,

v.

EDISON BROTHERS APPAREL
STORES, INC., Defendant.

No. C–87–886–WS.

United States District Court,
M.D. North Carolina,
Winston–Salem Division.

Feb. 19, 1993.

Harold L. Kennedy, III, Harold L. Kennedy, Jr., Kennedy, Kennedy, Kennedy & Kennedy, William L. Durham, Winston–Salem, NC, for plaintiff.

James M. Powell, Haynsworth, Baldwin, Johnson and Greaves, P.A., Greensboro, NC, Joslin Davis, Davis & Harwell, P.A., Winston–Salem, NC, Robert S. Phifer, Haynsworth, Baldwin, Johnson and Greaves, P.A.,

Gregory P. McGuire, Haynsworth, Baldwin, Johnson and Greaves, P.A., Greensboro, NC, for defendant.

## MEMORANDUM OPINION

OSTEEN, District Judge.

Faced with a jury verdict of $225,000.00 based upon Plaintiff LaDonna Harrison's claim for negligent retention,[1] Defendant Edison Brothers Apparel Stores, Inc. ("Edison") moves for judgment as a matter of law pursuant to Fed.R.Civ.P. 50, and in the alternative, a motion for a new trial pursuant to Fed.R.Civ.P. 59. For the reasons discussed below this court will GRANT Defendant's motion for judgment as a matter of law.

## I. Statement of the Case

In November 1987, Ms. Harrison brought this suit against Edison and its Store Manager, Melvin "Shane" Wall, Jr., amidst her allegations of egregious sexual harassment by Wall. Ms. Harrison asserted claims against Wall for battery and intentional infliction of emotional distress. Identical claims were brought against Edison on a vicarious liability theory. Additionally, Ms. Harrison sought recovery from Edison for negligent retention of an employee and wrongful discharge.

The matter was removed to this court through diversity jurisdiction. Wall counterclaimed for intentional infliction of emotional distress. On or about May 30, 1989, Ms. Harrison and Wall dismissed with prejudice their claims against one another. Edison was not a party to the stipulation for dismissal, which purported to preserve all of Ms. Harrison's claims against Edison.

Edison moved for summary judgment. The motion, heard by Senior Judge Eugene A. Gordon, was granted in part and denied in part on November 7, 1989. *Harrison v. Edison Brothers Apparel Stores, Inc.*, 724 F.Supp. 1185 (M.D.N.C.1989). The district court held that the dismissal with prejudice of Wall acted as an adjudication that Wall was not liable for emotional distress or battery and, therefore, that Edison, whose potential liability on those claims was solely derivative, could not be held liable. *Id.* at 1187-90. Edison suggested that Plaintiff's negligent retention claim should be dismissed on the same grounds. The district court disagreed, finding that based on an issue preclusion analysis, the voluntary dismissal with prejudice did not destroy Ms. Harrison's negligent retention claim. *Id.* at 1190-91. The district court also found that Ms. Harrison did not state a claim for wrongful discharge under North Carolina law. *Id.* at 1191-93.

Ms. Harrison appealed. The Fourth Circuit affirmed summary judgment for Edison as to the vicarious liability claims. *Harrison v. Edison Brothers Apparel Stores, Inc.*, 924 F.2d 530, 534-35 (4th Cir.1991). It reversed as to the wrongful discharge claim. *Id.* at 532-34. Edison did not cross appeal. Therefore, the negligent retention issue has not yet been before the Court of Appeals.

Thus, in November 1992, Ms. Harrison came to trial on two claims against Edison: (1) wrongful termination of Ms. Harrison in violation of public policy, and (2) negligent retention of the manager-employee. At the close of the evidence, Defendant moved for judgment as a matter of law pursuant to Rule 50, and the court reserved ruling on the matter, sending the case to the jury. The jury found that Edison did not wrongfully terminate Ms. Harrison. The jury did find that Edison was negligent in retaining Wall and awarded $225,000.00 in actual damages for emotional injury. No punitive damages were awarded.

The court must now consider Edison's renewed motion for judgment as a matter of law under Fed.R.Civ.P. 50. In the alternative, the court will review Edison's motion for a new trial pursuant to Fed.R.Civ.P. 59.

## II. Summary of the Critical Evidence Presented to the Jury

Ms. Harrison was hired by Edison at its Jeans West store in Winston-Salem, North

---

1. Negligent retention, as the jury was instructed, encompasses negligent supervision of an employee as well. For the sake of brevity, this opinion will refer to "negligent retention and supervision" as simply "negligent retention."

Carolina, on or about November 10, 1986, where she remained employed until December 18, 1986—a total of approximately forty (40) days. During Ms. Harrison's tenure at Jeans West, Wall was the store manager.

Ms. Harrison testified that between November 23 and December 18, 1986, Wall engaged in non-consensual touching of her person, made sexually suggestive comments to her, and requested sex. In short, Ms. Harrison testified to egregious sexual harassment by Wall. The details of this testimony are in the trial record and summarized in *Plaintiff's Brief in Opposition to Defendant's Motion for Judgment as a Matter of Law or In The Alternative for a New Trial* at 6–10.

Plaintiff's friend, Annette Weeks Perkins, testified that she saw Wall rub against Ms. Harrison with his penis area one night during December 13–15, 1986. JoAnn Willis Dixon, manager of another store in the mall, testified that she remembered a time when Ms. Harrison came into her store crying and complaining of Wall sexually harassing her. There is no evidence as to whether Mrs. Dixon saw this before or after December 12, 1986, a date of critical importance to the matters under consideration here.

Plaintiff's father, Jimmy Harrison, testified that Ms. Harrison told her parents that Wall was sexually harassing her by rubbing up against her and fondling her. Again, no dates were in evidence.

George Sanders, who married Ms. Harrison in 1988, testified that Ms. Harrison told him that when she was working at Jeans West Wall sexually harassed her. Plaintiff did not establish any specific time in this corroborative evidence.

Wall testified that sexual harassment did not occur. He did testify that on December 8, 1986, he had kissed Ms. Harrison on the cheek after she had discovered a paperwork error that Wall believed represented a $200.00 loss. Wall described this kiss as a

spontaneous peck on the cheek. Kim Scott, an employee at Jeans West, testified that she saw the kiss and described the kiss as Wall did. Ms. Harrison testified that the kiss was forceful, that Wall locked his arms around her, pulled her toward his chest, and kissed her half on the mouth and half on her face. Ms. Harrison testified that she started crying, ran to the bathroom, and locked the door. She testified that she scrubbed her face until it almost bled, and that she could not remove the feeling of the kiss. Ms. Harrison testified that she then left the store while Wall was at the cash register. Wall and Scott testified that Ms. Harrison did not react this way. They testified that Wall gave her $5.00 as a reward for finding the paperwork error, that Ms. Harrison took the money, and purchased lunch for herself.

Ms. Harrison testified that she first reported sexual harassment to Edison's Regional Manager Nick Poulos, on or about December 12, 1986. She testified that they reviewed her handwritten list of 18 complaints, none of which explicitly made any reference to sexual harassment. *See* Pl.'s Ex. 1. Ms. Harrison testified, however, that sexual harassment was discussed under Item 17 on the list titled, "What is to be done." Poulos testified that he was not told of any touching, fondling, or sexually explicit language. He testified that under Item 17 and Item 18 titled, "Prospects of a new job if not satisfactory," the discussion involved Ms. Harrison's belief that she could manage the store if Wall were fired, and that if something were not done, she would accept an offer from another store. Poulos testified that he and Ms. Harrison discussed the kissing incident, and that the discussion was consistent with Wall's and Scott's version of the kiss. Poulos testified that they also discussed Wall's flirting with female customers, use of profanity, and the circumstances surrounding the departure of Barbara Shipman, a former employee at Jeans West.[2] Ms.

---

**2.** Barbara Shipman was employed at Jeans West for three days in November 1986. Ms. Harrison testified that Ms. Shipman left her employment at Jeans West because of sexual harassment and threats by Wall. Ms. Harrison also testified that she told Poulos about this on December 12, 1986. Poulos testified that Ms. Harrison did tell him

that Shipman left her employment at Jeans West because of Wall, but that no accusation was made that Wall had sexually harassed or threatened Ms. Shipman. Ms. Shipman testified that Wall had flirted with her and that he had told her that she could "do better" than her boyfriend. She further testified that she did not feel that she

Harrison testified that she did not intend to try to get Wall fired as a result of her complaints.

The evidence showed that Ms. Harrison, Wall, and Poulos met and discussed Ms. Harrison's complaints. Ms. Harrison testified that the touching, fondling, and sexual remarks were discussed. She also testified that Wall admitted to his harassing behavior. Poulos and Wall testified that touching, fondling, and sexual remarks were not discussed and that Wall did not admit to such conduct since such conduct was not mentioned and did not occur.

Ms. Harrison testified that egregious sexual harassment continued and, in fact, intensified after the December 12, 1986, meeting. She testified that it continued until her employment ended at Jeans West on December 18, 1986.[3] For a summary of Plaintiff's evidence at trial concerning the December 12–18 period, *see Plaintiff's Brief in Opposition to Defendant's Motion for Judgment as a Matter Of Law or In The Alternative for a New Trial* at 8–10.

Edison produced evidence which conflicts with the evidence presented by Ms. Harrison at trial. *See Memorandum Supporting Defendant's Motion for Judgment as a Matter Of Law or In The Alternative for a New Trial* at 16–21, 36–39.

Poulos spoke with Ms. Harrison on the phone several times during the week of December 12–18. Ms. Harrison testified that she told Poulos that "things were still the same." Poulos testified that during one of their conversations that week, Ms. Harrison told him that things were improving with the employees. Poulos testified that during one phone conversation Wall told him things were better.

As to damages, Ms. Harrison testified that she had been raped in 1984. She testified that the sexual harassment made her relive the rape.[4]

The deposition of Dr. Selwyn Rose, an expert in psychiatry, was read into evidence.[5] Dr. Rose first saw Ms. Harrison in April 1988. According to Dr. Rose's testimony and records, Ms. Harrison told Dr. Rose that she was sexually harassed before, but not after, the December 12, 1986, meeting with Poulos. *See* Pl.'s Ex. 3, notes of 4–18–88. Dr. Rose saw Ms. Harrison again in May 1988, when she was hospitalized with a disassociative episode. *See* Pl.'s Ex. 3, 5–19–88 Discharge Summary. Dr. Rose also saw Ms. Harrison in December 1988, when she was hospitalized for cutting her wrist in what was called a "suicidal gesture." *See* Pl.'s Ex. 3, 12–31–88 Discharge Summary. Dr. Rose diagnosed Ms. Harrison with histrionic personality disorder, adjustment disorder with mixed emo-

was being threatened or harassed and that at some point she was flirting with Wall as well.

3. The circumstances surrounding Ms. Harrison's departure from Jeans West were disputed. Ms. Harrison claimed she was terminated and Edison Brothers claimed that Ms. Harrison voluntarily quit. This issue was relevant to Ms. Harrison's wrongful discharge action. The jury found for Edison as to that claim, so that factual dispute is beyond the realm of the motion for judgment as a matter of law currently before the court.

4. Conflicting evidence exists as to whether this rape occurred. Plaintiff testified that she was raped by her high school boyfriend, Donald Cox, in 1984. Cox testified that he and Ms. Harrison had consensual sex several times. Ms. Harrison's deposition conflicted with her trial testimony in several ways. Ms. Harrison admitted at trial that she lied under oath at the deposition. She explained that the lie resulted from her confusion stemming from discussions between counsel at the deposition. Upon questioning by the court, in the absence of the jury, she contend-

ed she had lied to protect the anonymity of Donald Cox. Later, Plaintiff testified that her deposition testimony was a mistake. In addition, there was testimony to the effect that Ms. Harrison had told several people she had been raped by a black man. Cox is white. For a summary of this evidence from the perspective of the respective parties, *see Memorandum Supporting Defendant's Motion for Judgment as a Matter Of Law or In The Alternative for a New Trial* at 11, n. 7, 21–25, and *Plaintiff's Brief in Opposition to Defendant's Motion for Judgment as a Matter Of Law or In The Alternative for a New Trial* 19–21.

5. Dr. Rose is deceased. He first saw the Plaintiff approximately sixteen (16) months after the activities at Jeans West. He was the only physician consulted by Plaintiff after the alleged harassment, and he saw her only after this litigation had commenced. Thereafter, Dr. Rose referred Plaintiff to Ms. Susan Martin, a therapist, but no evidence was presented to the jury concerning Ms. Harrison's therapy with Ms. Martin.

tional features, and neurodermatosis. He also indicated a "diagnosis" of pregnancy in May 1988. *See* Pl.'s Ex. 3.

Other evidence of damage was presented by lay witnesses, including evidence of sexual dysfunction, nightmares, and depression.

The records of Dr. Michael Zanoli, Ms. Harrison's dermatologist, showed that Ms. Harrison was diagnosed with contact dermatitis in 1988. His records indicated that Ms. Harrison had told him that she had been having skin problems since October 1985. Dr. Zanoli's records also indicated a notation of "[d]ermatitis, most likely a neurodermatitis." Dr. Zanoli's records also showed that he had treated Ms. Harrison in June 1986, some five months before her employment at Jeans West. *See* Def.'s Ex. 27.

The evidence also showed that preceding Ms. Harrison's hospitalization in May 1988, Ms. Harrison had plans to be married, that Ms. Harrison was pregnant, and that severe difficulties arose between Ms. Harrison and her prospective in-laws.

The evidence showed also that Ms. Harrison moved away from home for the first time and, in fact, moved six times with her husband by the end of 1988. Ms. Harrison experienced two miscarriages. Marital problems ensued resulting in separation in December 1988.[6] Ms. Harrison also had pressures concerning this lawsuit.

Thereafter, the evidence showed that Ms. Harrison gave birth to a child while separated from Sanders. Ms. Harrison and Sanders reunited for a short time. They separated again and there were allegations made by Ms. Harrison that Sanders sexually abused their child. Ms. Harrison became pregnant again and gave birth to a second child, lead-ing to a paternity dispute between Ms. Harrison and Sanders.

Edison presented evidence of its anti-sexual harassment policy. Several employees of Jeans West testified that a telephone "hotline" poster with phone numbers was displayed in the Jeans West store. Ms. Harrison testified that she was unaware of the policy or the poster.

## III. Applicable Legal Standards

### A. *Judgment as a Matter of Law*

The Fourth Circuit has held that:

A district judge may overturn a jury verdict on a motion for j.n.o.v.[7] only if 'there is no legally sufficient evidentiary basis for a reasonable jury to have found for [the prevailing] party.' Fed.R.Civ.P. 50(a)(1). In making this determination the judge is not to weigh the evidence or appraise the credibility of the witnesses, but must view the evidence in the light most favorable to the non-moving party and draw legitimate inferences in its favor.

*Anheuser–Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316, 318 (4th Cir.1992) (citation omitted). A motion for judgment as a matter of law can only be granted, if "viewing the evidence most favorable to the party opposing the motions, a reasonable trier of fact could draw only one conclusion." *Walker v. Pettit Constr. Co.,* 605 F.2d 128, 130 (4th Cir.1979). The standard of review for a motion for judgment as a matter of law is essentially the same as the standard of review for a motion for summary judgment. *See Advisory Committee's Note to 1991 Amendment to Rule 50 of the Federal Rules of Civil Procedure.*[8]

---

6. Ms. Harrison has apparently made allegations that her husband was financially irresponsible and obsessed with pornography. When asked about pornography at trial, Sanders refused to answer on Fifth Amendment grounds.

7. Effective December 1, 1991, the terminology has changed from "j.n.o.v." and "directed verdict" to "judgment as a matter of law." Fed. R.Civ.P. 50.

8. In addition, a federal district court is precluded from entertaining a motion for judgment as a matter of law unless the movant has first sought a judgment as a matter of law after all of the evidence. "When this prerequisite has not been satisfied, a party cannot later challenge the sufficiency of the evidence either through j.n.o.v. [now "judgment as a matter of law"] or on appeal. *Bohrer v. Hanes Corp.,* 715 F.2d 213, 216 (5th Cir.1983). "A litigant who has moved for directed verdict at some point prior to the conclusion of trial, but has failed to renew the motion at the close of all the evidence, is thus held to have waived the right to move for judgment *non obstante veredicto.*" *Id.*

In the case at bar, Plaintiff states that Defendant moved for judgment as a matter of law at the close of Plaintiff's evidence, but did not move

### B. Negligent Retention

■ North Carolina law recognizes a cause of action against an employer for negligence in employing, retaining, or supervising an employee whose wrongful conduct injures another. *See Hogan v. Forsyth Country Club Co.*, 79 N.C.App. 483, 494–95, 340 S.E.2d 116, 123–24 (1986).

> '[I]t must be established by a greater weight of the evidence, the burden being on the plaintiff, that he has been injured by reason of carelessness or negligence due to the incompetency of the fellow servant, and that the master has been negligent in employing or retaining such an incompetent servant, after knowledge of the fact, either actual or constructive.' *Pleasants v. Barnes*, 221 N.C. 173, 177, 19 S.E.2d 627, 629 (1942). The theory of liability is based on negligence, the employer being held to a standard of care that would have been exercised by ordinary, cautious and prudent employers under similar circumstances. However, before the employer can be held liable, plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the

act, the employer knew or had reason to know of the employee's incompetency.

*Id.* 340 S.E.2d at 124 (citation omitted).

Furthermore, since Ms. Harrison sought only emotional distress damages, this case is essentially one of negligent infliction of emotional distress. As a result, it was necessary for Ms. Harrison to prove that her injury was "severe"—that is, Ms. Harrison must show that she suffered an "emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Johnson v. Ruark Obstetrics*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990).[9]

■ Thus, in sum, to succeed on her claim for negligent retention Ms. Harrison had to prove (1) actual or constructive notice to Edison that Wall had a propensity to engage in sexual harassment, (2) subsequent sexual harassment by Wall, (3) failure by Edison to act in a reasonable manner under the circumstances to prevent the subsequent tortious conduct from occurring, and (4) actual injury to Ms. Harrison in the form of severe emotional distress, (5) caused [10] by Wall's subsequent sexual harassment.

---

for judgment as a matter of law at the close of all the evidence when Defendant rested. Defendant did renew its motion during the charge conference. Plaintiff argues that this sequence of events resulted in Defendant waiving its right to pursue a motion for judgment as a matter of law.

This court finds that no waiver occurred. There is no surprise or unfairness to the Plaintiff, and no untimeliness in allowing this motion to be considered.

9. In developing the jury instructions for this case an issue was raised concerning emotional distress damages. Defendant argued that *Ruark* was controlling and that the jury should be instructed that Plaintiff Harrison needed to prove "severe" emotional distress. Plaintiff, to the contrary, argued that *Ruark* was not relevant, that no instruction concerning "severe" emotional distress was necessary, and that the generic pattern instruction on emotional and mental distress was appropriate.

The court struggled with this issue, recognizing that there was merit to both arguments. On the one hand, Plaintiff's theory was negligence and the only damages sought were those for emotional distress. Hence, in substance the negligent retention claim was essentially a claim of negli-

gent infliction of emotional distress. Under this theory, *Ruark* is applicable. On the other hand, a more formal approach would limit *Ruark* to claims labelled negligent infliction of emotional distress. Under this theory, the fact that the cause of action pursued is labelled negligent retention rather than negligent infliction of emotional distress, makes *Ruark* inapplicable.

The court's judgment was ultimately to pursue substance over form and conclude that *Ruark* applied even though the cause of action was labelled as a negligent retention claim. However, the court, in its discretion, chose to instruct the jury using the *Ruark* definition of "severe emotional distress" rather than using the word "severe" in the charge. The court made this decision because it was concerned that the everyday use of the term "severe" might have a different, or at least less clear, connotation than the definition adopted by the North Carolina Supreme Court in *Ruark*.

10. This causation element is also explicitly required by *Ruark* in negligent infliction of emotional distress claims. That is, the severe emotional distress must be a "proximate and foreseeable result of the defendant's negligence." *Ruark*, 327 N.C. at 304, 395 S.E.2d at 97.

IV. Grounds for Judgment as a Matter of Law

Early in the history of this litigation, Plaintiff dismissed with prejudice her claims for battery and intentional infliction of emotional distress against Wall. This dismissal with prejudice resulted in summary judgment for Edison as to the claims which were based on a vicarious liability theory. *Harrison,* 924 F.2d at 534–35; *Harrison,* 724 F.Supp. at 1187–90. As the Fourth Circuit aptly and prophetically stated:

> Harrison made an inadvertent but grave mistake by dismissing Wall with prejudice. A court has no appealing choice when a party seeks to unscramble the egg it has made for itself. A meritorious claim may be foreclosed for technical reasons; a defendant may be denied the victory to which the letter of the law entitles him.

*Harrison,* 924 F.2d at 535. Indeed, the trial of this matter was in one sense the next chapter of the continuing efforts of Plaintiff and her lawyers to "unscramble the egg."

After the dismissal of Wall with prejudice, the nature of the lawsuit was substantially and significantly altered. Without the vicarious liability claims, the case was transformed from one in which sexual harassment (i.e., battery and intentional infliction of emotional distress) would have been the ultimate issue, to a case about the negligence of the employer. With the luxury of hindsight, it has become clear that the trial was, to a large extent, an attempt to force evidence supporting a vicarious liability claim for sexual harassment, into a negligent retention legal theory.

Unfortunately, a negligent retention legal theory is not the proper mechanism for pursuing a vicarious liability claim. While the causes of action are similar, at least one difference between a negligent retention theory and a vicarious liability theory is crucial to the resolution of the case. Under a vicarious liability theory, if the employer ratified the employee's conduct, the employer can be liable for all of its employee's tortious conduct, *before and after* ratification occurred.[11] However, under a negligent retention theory, the employer can be liable only for the tortious conduct of its employee that occurs *after* the employer was put on notice. After all, the defendant employer has not acted negligently in retaining an employee unless it knew, or should have known, of its employee's tortious tendencies.

This distinction is critical to the resolution of the motion for judgment as a matter of law. The evidence demonstrates that the earliest Edison could have had actual or constructive notice of any propensity of Wall to engage in tortious conduct was December 12, 1986, which was the date that Ms. Harrison met with Poulos to discuss her complaints. Ms. Harrison's employment ended six days later on December 18, 1986. Consequently, under a legal retention theory, the only tortious conduct that Edison can be held liable for is conduct that occurred between December 12 and December 18, 1986. As a result, Ms. Harrison's testimony concerning sexual harassment that occurred before December 12, 1986, is not relevant to her damages or the amount of Edison's liability.[12]

The court now turns to a more detailed discussion of the legal insufficiency of the evidence as to crucial elements of Plaintiff's negligent retention claim.

A. *The Legal Insufficiency of the Evidence as to the "Causation" Element of Negligent Retention*

██ The clearest insufficiency in the evidence concerns the causation element of

---

**11.** In order to prevail on claims for battery and intentional infliction of emotional distress against an employer on a vicarious liability theory, a plaintiff must establish that the tortious conduct was committed by an agent of the employer, and such conduct was either (1) expressly authorized by the employer, (2) committed within the scope of the agent's employment, or (3) ratified by the employer. *Brown v. Burlington Indus.,* 93 N.C.App. 431, 436, 378 S.E.2d 232, 235 (1989); *Hogan v. Forsyth Country Club Co.,* 79 N.C.App. at 491, 340 S.E.2d at 121. Ratification was the theory that Plaintiff apparently intended to pursue before inadvertently abandoning the claim.

**12.** Though not relevant to damages, the evidence of pre-notice harassment was relevant to the issue of notice. That is, there had to be some conduct for Edison to have notice of. Perhaps the admissibility of this evidence created a high likelihood of jury confusion on the ultimate issues in the case.

Plaintiff's case. As noted above, to succeed on a negligent retention claim, as on any negligence claim, an injured plaintiff must prove a causal connection between his or her injury and the tortious conduct of the defendant. *See Hogan v. Forsyth Country Club Co.,* 79 N.C.App. at 494–95, 340 S.E.2d at 123–24. *See also* W. Page Keeton et al., *Prosser & Keeton On The Law Of Torts* § 30, at 164–65 (5th ed. 1984). As also indicated above, this means that Ms. Harrison must prove a causal link between her emotional injuries and the harassment that occurred between December 12–18, 1986.

In the context of a motion for judgment as a matter of law, the inquiry for the court in analyzing causation is whether the jury was presented with evidence "which shows a 'probability' and not mere 'possibility' " that causation existed as contended. *Ralston Purina Co. v. Edmunds,* 241 F.2d 164, 168 (4th Cir.1957). "Alternative possibilities as to the cause of an event are not enough where the defendant is liable under one and not the others and where no basis for a rational choice among the alternatives is provided." *Id. See also Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 241–42 (4th Cir.1982).

Ms. Harrison has not proven such a causal link between her injuries and the events of December 12–18, 1986. At best, the evidence shows only a mere "possibility," not "probability," that causation exists as contended. In other words, Ms. Harrison has not presented evidence upon which a reasonable jury could find that the alleged sexual harassment of December 12–18, 1986, caused her injuries.

First and foremost, Ms. Harrison presented no direct evidence of a causal connection between her emotional injuries and the events of December 12–18, 1986. For example, no expert testified that Ms. Harrison's emotional damage was the result of sexual harassment that occurred between December 12–18, 1986, as opposed to sexual harassment that occurred before December 12, 1986. Given that Edison is not liable for pre-December 12, 1986, tortious conduct by its employee, such expert testimony was necessary.[13]

Secondly, the expert testimony that Plaintiff did present shows that her own expert was not even aware that Mrs. Harrison was sexually harassed between December 12 and 18, 1986. Dr. Rose's notes indicate that Ms. Harrison told him that she was harassed up until she reported the incident to Poulos on December 12. However, as to the events that occurred after December 12, Dr. Rose's notes simply indicate that "Shane [Wall] got mad at me because I went over his head—he got real rude, talked to all employees—everyone stopped talking to me—on December 18th I couldn't tolerate it any more...." *See* Pl.'s Ex. 3. Thus, it is impossible for Dr. Rose to have connected Ms. Harrison's emotional problems with the events of December 12–18. Dr. Rose did not even know that such events occurred.

Thirdly, two of Dr. Rose's diagnoses are, by definition, not causally related to Ms. Harrison's severe emotional distress.[14] Histrionic personality disorder refers to personality structure, and Plaintiff concedes that personality structure cannot be caused by one week of events.[15] An adjustment disorder with mixed emotional features is manifested within three months of the stressful events. This diagnosis took place in 1988, eighteen (18) months after the December 12–18 period. Thus, by definition, there is not a sufficient causal link between these diagnoses and December 12–18, 1986. *See* Trial Tr. Nov. 24, 1992 at 187–92.

Furthermore, as to the diagnosis of neurodermatosis, the records of Dr. Michael Zanoli, the only evidence from an expert in der-

13. Interestingly, Plaintiff's counsel at the hearing on this motion suggested to the court that such expert proof of a causal link to December 12–18, 1986, was impossible. This may be the case, but as such, judgment as a matter of law is required.

14. As indicated above, Dr. Rose diagnosed Ms. Harrison to have the following disorders: (1) histrionic personality disorder, (2) adjustment disorder with mixed emotional features, and (3) neurodermatosis. *See* testimony of Dr. Rose and Pl.'s Ex. 3.

15. Plaintiff's theory was that this histrionic personality structure caused her damages to be more severe than they otherwise would have been.

matology,[16] indicate that Ms. Harrison had told him that she had been having skin problems since October 1985—long before her employment at Jeans West. Dr. Zanoli's records also show that he had treated Ms. Harrison in June 1986, again prior Ms. Harrison's employment at Jeans West. *See* Def.'s Ex. 27. Thus, there is nothing in the records causally connecting Ms. Harrison's skin problems to the events of December 12–18, 1986.

Additionally, Ms. Harrison has suffered numerous stressors from December 1986 to the present. For example, prior to her hospitalization in May 1988, the evidence showed that Ms. Harrison had plans to be married, had severe difficulties with her prospective in-laws, and was pregnant. Thus, it is highly probable that Ms. Harrison's emotional problems were caused by the immediate stressors in her life in 1988, not experiences of December 12–18, 1986, at Jeans West. Indeed, Dr. Rose's diagnosis of Ms. Harrison in May 1988 included pregnancy. *See* Pl.'s Ex. 3, 5–19–88 Discharge Summary. The Fourth Circuit's words merit repeating: "Alternative possibilities as to the cause of an event are not enough where the defendant is liable under one and not the others...." *Ralston Purina*, 241 F.2d at 168; *see also Lovelace* at 241–42. As this evidence shows, at best, Plaintiff has only proven alternative possible causes of her emotional injury.

Similar alternative possibilities as to causation preceded Ms. Harrison's December 1988 hospitalization. After marrying Sanders, Ms. Harrison moved away from home for the first time and, in fact, moved six times with her husband by the end of 1988. Ms. Harrison experienced two miscarriages. There were pressures concerning this lawsuit, as well. Marital problems ensued resulting in separation in December 1988. Ms. Harrison made a "suicidal gesture" at that time by making a small cut on her wrist. Again, it is highly probable that the emotional disorders diagnosed by Dr. Rose were caused by the immediate stressors in Ms. Harrison's life in 1988, not experiences of December 12–18, 1986. In any case, no evidence has been presented causally connecting these problems and the week of December 12–18, 1986.

Similarly, as to the evidence presented by lay witnesses which is arguably evidence of "severe" emotional injury [17]—including testimony that Ms. Harrison experienced problems with sexual dysfunction, nightmares, and being depressed and withdrawn—no causal connection has been proven. Leaving aside the issue of whether expert medical testimony is necessary to substantiate these problems, there is no evidence that creates a reasonable probability that these problems were caused by sexual harassment between December 12–18, 1986. All the other stressors mentioned above appear to be the probable causes, and certainly are equally possible alternative causes.

As to Ms. Harrison's contention that this type of emotional distress continued beyond 1988 to the present, the result is the same. Again, leaving aside the issue of whether expert medical testimony is needed to substantiate the post–1988 emotional problems, the evidence also shows that Ms. Harrison suffered from many other stressors in her personal life after 1988. Ms. Harrison gave birth to a child while separated from Sanders. Ms. Harrison and Sanders reunited for a short time and separated again. There were allegations made by Ms. Harrison that Sanders sexually abused their child. Ms. Harrison became pregnant again and gave birth to a second child, leading to a paternity dispute between Ms. Harrison and Sanders.

**16.** Dr. Rose was not an expert in dermatology, therefore, it is questionable if any weight should be given to Dr. Rose's diagnosis of neurodermatosis. The only evidence from a dermatology expert are the records of Dr. Zanoli. These records show that, in 1988, Ms. Harrison was diagnosed with contact dermatitis and not neurodermatosis. Somewhat confusingly, Dr. Zanoli also indicates in his notes that Ms. Harrison suffered from "[d]ermatitis, most likely a neurodermatitis." Thus, it is questionable whether the evidence is even sufficient to support a finding that Ms. Harrison suffers from neurodermatosis.

**17.** Unfortunately, *Ruark* does not make clear whether "severe" emotional distress must be proven by expert psychiatric testimony or not. For purposes of this motion, the court will assume that such expert testimony is not required by *Ruark*, but does not decide the issue and does not intend this assumption to have any precedential effect.

Thus, the most likely and only reasonable conclusion is that the bulk of her emotional problems has been caused by immediate stressors. In any case, the connection between these post–1988 problems and the week of December 12–18, 1986, is too remote and speculative to support a jury verdict.

Thus, in summary, there is no doubt that Ms. Harrison has suffered from emotional distress over many years and is presently a very emotionally distraught person. However, there is also very little doubt that these emotional problems were caused by stressors other than the experiences of December 12–18, 1986. In the least, these other stressors are possible alternative causes of Ms. Harrison's emotional injuries, and there is no evidence presented as to which possible cause is the correct one. Even assuming that sexual harassment occurred between December 12 and December 18, 1986, assuming that Edison had notice on December 12, 1986, of Wall's propensity to engage in tortious conduct, assuming that Edison did not exercise ordinary care, and assuming that Plaintiff suffers and has suffered severe emotional distress, the casual link between Plaintiff's emotional problems, and the harassment of December 12–18, 1986, is too remote as a matter of law.

Therefore, Defendant's motion for judgment as a matter of law will be GRANTED.

### B. The Legal Insufficiency of the Evidence as to the Sexual Harassment During December 12–18, 1986

While this court finds the causation issue to be the clearest basis for judgment as a matter of law, it is useful to note that other grounds exist to independently support a judgment as a matter of law, or in the least, to bolster the conclusion that judgment as a matter of law is required.

As indicated above, one essential element of Plaintiff's case is proof that Wall engaged in tortious conduct between December 12–18, 1986. Conflicting evidence was presented to the jury as to this element.

Ms. Harrison testified that egregious sexual harassment by Wall occurred after December 12. In addition, Annette Weeks Perkins testified that she saw Wall rub against Ms. Harrison with his penis area around 9:30 p.m. one night during December 13–15.

However, there is evidence to the contrary. Wall testified that such harassment never occurred. Ms. Harrison's taped interview of April 30, 1987 (Def.'s Ex. 12), sets forth admissions by Ms. Harrison that nothing happened during the December 12–18 period that resembled Ms. Harrison's trial testimony.[18] Harrison's first affidavit (Def.'s Ex. 13) and second affidavit (Def.'s Ex. 14) make no specific allegations like those at trial. Dr. Rose's notes also indicate that sexual harassment did not occur after December 12, 1986. Furthermore, the time sheets indicate that Ms. Harrison was not present at some of the times she claimed harassment occurred. There is evidence, however, that many employees were at the Jeans West store at some of the times when they were not scheduled to work. See Memorandum Supporting Defendant's Motion for Judgment as a Matter of Law or in the Alternative For a New Trial at 36–39 for a more detailed summary of this conflicting evidence.

Resolution of this issue, in isolation, leaves to the court a difficult task of reconciling the tension between two maxims of judgment as a matter of law analysis. On the one hand, it is the trial court's duty to view the substantive evidence in the case to determine if it can support a verdict. On the other hand, it is also the trial court's duty to avoid credibility determinations and substituting its own factual judgment for that of the jury. Anheuser–Busch, 962 F.2d at 318.

The tension between these two rules of law arises because much of the conflicting evidence serves dual purposes at trial. The evidence serves both as substantive evidence of sexual harassment and as impeachment evidence to weaken Ms. Harrison's credibility. Thus, it appears that this court must view this evidence as substantive evidence of sexual harassment, but must not consider it

---

**18.** This taped interview should not have been admitted into evidence, but it was without objection at the time. The jury was instructed to ignore the statements on the tape made by witnesses who did not testify.

for the purpose of assessing Ms. Harrison's credibility.[19]

*Barwick v. Celotex Corp.,* 736 F.2d 946, (4th Cir.1984) offers some insight as to the proper way to approach the issue. 736 F.2d 946, 959–60. In *Barwick,* the Fourth Circuit held that the district court properly disregarded plaintiff's affidavit opposing defendant's summary judgment motion where that affidavit plainly contradicted the plaintiff's sworn deposition testimony. *Id.* at 959–60. *See also Radobenko v. Automated Equip. Corp.,* 520 F.2d 540, 543–44 (9th Cir.1975) (conflicting statements by plaintiff on material issues did not suffice to create genuine issues for trial).

Viewing the conflicting substantive evidence of sexual harassment between December 12 and December 18, 1986, it appears to this court that judgment as a matter of law is appropriate under the rationale of *Barwick* and *Radobenko.* That is, faced with such extreme conflicting evidence, including conflicting evidence from the Plaintiff herself, no reasonable fact finder could conclude harassment occurred between December 12–18, 1986. In the very least, the serious conflicts in the evidence bolster the conclusion that judgment as a matter of law is appropriate.[20]

## V. Grounds for a New Trial

Fed.R.Civ.P. 50(c)(1) provides that:

If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial.

Thus, with an eye toward efficient use of judicial resources, the court will conditionally address Defendant's alternative motion for a new trial.[21]

At least two grounds exist for conditionally granting the motion for a new trial. First, based on all of the conflicting evidence presented in this case, combined with the court's credibility determinations, the court finds the jury verdict to be against the weight of the evidence. Second, the court likely erred by not submitting the question of contributory negligence to the jury.[22]

The first ground need not be addressed at length. All of the reasons for granting judgment as a matter of law are applicable. The lack of evidence as to causation and the conflicting evidence as to other elements of Plaintiff's *prima facie* case result in a verdict against the weight of the evidence. Additionally, based on the court's own credibility assessments, much of the critical testimony was not believable.

As to the second ground, at the time of the charge, it appeared to the court that an

---

19. This may be a difficult task, given that a trial court necessarily has some impressions as to credibility of witnesses, but it is not an impossible one. Indeed, we ask juries to make such distinctions with nearly every limiting instruction given during a trial. Surely the court can make this distinction as well as a jury. In any case, the distinction necessarily must be made if this court is to fulfill its duty to properly review the evidence in the context of a motion for judgment as a matter of law.

20. Edison suggests several other grounds for judgment as a matter of law including: (1) that there is no legally sufficient evidence to support a reasonable inference that Edison had notice; and (2) that there is no legally sufficient evidence to support a reasonable inference that Edison did not use ordinary care. Having found that judgment as a matter of law is appropriate, this court declines to address these issues at this time.

21. A new trial invokes the trial court's discretionary powers. "[I]n assessing the need for a new trial, the trial judge 'may weigh the evidence and consider the credibility of the witnesses' to assess whether the verdict will result in a miscarriage of justice.... [T]his is not a discretionary task, but a duty, as our cases have repeatedly emphasized." *Swentek v. USAIR, Inc.,* 830 F.2d 552, 559 (4th Cir.1987) (citations omitted). The grounds upon which a new trial may be ordered are numerous, such as: the jury's verdict is against the weight of the evidence; the jury's verdict is based on false evidence; the jury's verdict is excessive; or the court erred by withdrawing or not submitting a material error. *See* 6A *Moore's Federal Practice,* ¶ 59.08[1] (2d ed).

22. In considering whether Defendant's evidence of Plaintiff's contributory negligence required a jury instruction, the court must view the evidence in the light most favorable to Edison. *Chavis v. Finnlines Ltd., O/Y,* 576 F.2d 1072, 1083 (4th Cir.1978) (citations omitted).

instruction as to contributory negligence would be superfluous. The court's rationale at that time was that any evidence tending to prove contributory negligence equally tended to prove that the notice element of Plaintiff's negligent retention claim was not met. In other words, the court thought it would be logically inconsistent for a jury to find that Defendant had negligently retained Wall and that Ms. Harrison was contributorily negligent. However, it later occurred to the court that there were several other ways in which Ms. Harrison could have been contributorily negligent. For example, viewing the evidence in the light most favorable to the Defendant, Ms. Harrison did not call the hotline number to report any sexual harassment. Also, according to Poulos, Ms. Harrison told Poulos on the phone that things were improving with the employees the week of December 12–18, 1986. Thus, an instruction concerning contributory negligence should have been given.

## VI. Conclusion

Therefore, for the reasons stated herein, Defendant's motion for judgment as a matter of law is granted. In the alternative, pursuant to Rule 50(c)(1), Defendant's motion for a new trial is conditionally granted.