**Peggy S. JOHNSON, Plaintiff**

v.

**Marvin RUNYON, Postmaster General, Defendant.**

**Civil No. AMD 94–3415.**

United States District Court, D. Maryland.

May 31, 1996.

---

**578**

W. Michael Pierson, Baltimore, MD, for plaintiff.

Lynne A. Battaglia, United States Attorney, Charles J. Peters, Assistant United States Attorney, Baltimore, MD, for defendant.

MEMORANDUM OPINION

DAVIS, District Judge.

## I. INTRODUCTION

This discrimination action is comprised of four separate claims which were consolidated at an Equal Employment Opportunity ("EEO") administrative hearing. Plaintiff, Peggy S. Johnson ("Johnson"), a black female, alleges race, sex and retaliatory discrimination, and sexual harassment against Marvin Runyon, Postmaster General, United States Postal Service ("Postal Service"), in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* As redress, Johnson seeks declaratory, injunctive and various forms of corrective relief, and damages.

Pending before the Court is defendant's motion for summary judgment. The motion presents the following issues:

1. Whether Johnson has presented sufficient evidence to generate a dispute of material fact as to whether the Postal Service's asserted nondiscriminatory reasons for not promoting her to the Tour Superintendent, Designated Area position in November 1990 were pretextual?

2. Whether Johnson has sufficiently demonstrated a causal connection between her prior EEO activity and her non-promotion to make out a *prima facie* case of retaliatory discrimination?

3. Whether Johnson can make out a *prima facie* case of *quid pro quo* sexual harassment, and if so, whether she rebutted the Postal Service's proffered nondiscriminatory reasons for the adverse employment actions?

4. Whether the Postal Service unlawfully discriminated against Johnson in retaliation for her participation in protected EEO activity when she was given a rating of merely "Good" on her merit evaluation in 1992?

5. Whether the Postal Service unlawfully discriminated against Johnson in retaliation for her participation in protected activity when she was not selected for the

Management Progression Program in February 1993?

The Court deems no oral argument necessary. Local Rule 105.6 (D.Md.1995). After a careful review of the record in this case, the Court answers each of the aforestated issues in the negative, and shall therefore grant the motion for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11. This burden "is particularly strong when that nonmoving party [also] bears the burden of proof." *Pachaly v. City of Lynchburg,* 897 F.2d 723, 725 (4th Cir.1990). The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds,* — U.S. —, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Shealy,* 929 F.2d at 1012. Furthermore, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the non-moving party. *See Matsushita,* 475 U.S. at 587–88, 106 S.Ct. at 1356–57; *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Poller v. Columbia Broadcasting Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

In Title VII cases, courts should be wary of summary judgment motions because a party's intent is often the crucial element in such cases. *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 254 n. 8, 101 S.Ct. 1089, 1094–95 n. 8, 67 L.Ed.2d 207 (1981). Summary judgment is appropriate in such cases, however, where any factual dispute does not rise to the level of a "genuine issue of material facts." *See Boarman v. Sullivan,* 769 F.Supp. 904 (D.Md.1991) ("traditional precepts of summary judgment may apply, except where the evidence presents a genuine issue of motive"). Summary judgment should also be granted when a party "fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552. In the instant case, a careful review of the record establishes that there is no *genuine* dispute of *material* fact, and that defendant Postal Service is entitled to judgment as a matter of law on all claims.

## III. FACTS AND PROCEDURAL HISTORY

In this section, the Court shall set forth only introductory facts. Additional facts

shall be provided as they relate to a particular cause of action.

Johnson began her career with the Postal Service in 1976. Throughout her tenure, she has slowly progressed through the ranks of the Postal Service hierarchy and has served on numerous temporary assignments, or in postal parlance, "details," to high level supervisory positions, i.e., Tour Superintendent and Tour Superintendent, Designated Area ("Tour Superintendent, D.A.").[1] In August 1986, Johnson became General Supervisor, Mails, EAS–17. As a supervisor, she received ratings of "Very Good" during fiscal years 1988, 1989, 1990 and 1993. In 1991 and 1992, however, she received a "Good" rating. Johnson claims that, despite her quality work performance, the Postal Service has utilized a myriad of discriminatory devices to deny her much deserved promotions and career advancement opportunities. As a result, between 1990 and 1993, Johnson filed four complaints with the EEO Office, alleging that the Postal Service unlawfully discriminated against her on the basis of race and sex, and in retaliation for her prior EEO activity.

After a proper investigation, Johnson's EEO complaints were consensually consolidated and a hearing was held before an administrative law judge on April 13, 1994 and April 19, 1994. The parties were represented by counsel. On November 3, 1994, the administrative law judge issued her determination, finding as to each of Johnson's four complaints that she had failed to prove that the Postal Service had engaged in unlawful discrimination. Dissatisfied with the outcome of the administrative hearing, Johnson filed suit in this Court in December 1994.

## IV. DISCUSSION

### 1. First Claim: Failure to Promote

In August 1990, two vacancy announcements (# 59–90 and # 60–90) were issued for the position of Tour Superintendent, D.A., EAS–19 in the Baltimore, Maryland, Post Office. The application period was from August 2, 1990 to August 17, 1990. Six candidates, including Johnson, submitted applications for the vacancies and were all found by the Promotion Advisory Board to "best meet" the requirements of the Tour Superintendent, D.A. position.[2]

Johnson had been a General Supervisor since 1986. From time-to-time during the period December 1986 to February 1990, she had served as Acting Tour Superintendent in the Baltimore Post Office. When the Tour Superintendent, D.A. vacancies were announced, Johnson was in the Wilmington, Delaware, Post Office, completing a similar assignment that she had started in February 1990. Despite Johnson's experience and a stellar recommendation "without reservations" from the acting manager of the Wilmington Post Office, Johnson was not selected for either of the two Tour Superintendent, D.A. vacancies. On September 9, 1990, John Knott ("Knott") was assigned to vacancy # 59–90; later, on November 5, 1990, Eugene Pawloski ("Pawloski") was selected for vacancy # 60–90.

On November 9, 1990, Johnson filed an informal charge of discrimination with the EEO Office, alleging that she had been denied the promotion on the bases of race and sex, and in retaliation for her prior protected activity. On June 24, 1992, Johnson filed a formal EEO complaint as to these allegations. A hearing was held before an administrative law judge, who concluded that John-

---

1. During the time of Johnson's discrimination complaints, the Baltimore Post Office had three Tour Superintendents and three Tour Superintendent, D.A.'s. The Tour Superintendent, D.A. was the Tour Superintendent's assistant and dealt directly with the General Supervisors and lower level employees. The Tour Superintendent was responsible for the overall operation of mail processing during an eight hour tour. The Tour Superintendent was supervised by the Manager, General Mail Facility ("Manager, GMF"), who was responsible for the operation of the entire

post office facility. The Manager, GMF reported to the Director of City Operations and ultimately to the Field Division General Manager.

2. The candidates were:

| Peggy Johnson (plaintiff) | Black | Female |
|---|---|---|
| Roy Hayward | White | Male |
| Ralph Hooper | Black | Male |
| Anthony Pasko | White | Male |
| Eugene Pawloski | White | Male |
| Rodney Thorington | Black | Male |

son had not sufficiently demonstrated that she was a victim of discrimination.

Claiming that as a result of the Postal Service's discriminatory actions she has been deprived of wages and other employment benefits, and has suffered emotional distress and mental anguish, Johnson urges this Court to (1) issue a declaratory judgment that the Postal Service's acts, polices and practices violate Title VII; (2) enjoin the Postal Service from engaging in discriminatory practices; and (3) compel the Postal Service to appoint her as Tour Superintendent, D.A.

### a. Race and Sex Discrimination

■ In order to establish a *prima facie* case of failure to promote, Johnson must show that

(1) [s]he is a member of a protected group;

(2) [s]he applied for the position in question;

(3) [s]he was qualified for the position; and

(4) [s]he was rejected for the position in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination.

*Alvarado v. Board of Trustees*, 928 F.2d 118, 121 (4th Cir.1991).

■ Proof of a *prima facie* case gives rise to an inference of discrimination which the Postal Service can rebut by presenting evidence that Johnson was rejected for legitimate non-discriminatory reasons. If the Postal Service meets this burden, Johnson is then given a chance to show that the Postal Service's proffered reasons are merely pretextual. *See Texas Dept. of Comm. Aff. v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *McNairn v. Sullivan*, 929 F.2d 974, 978 (4th Cir.1991).

The Postal Service has conceded that Johnson satisfies the elements of a *prima facie* case of race and sex discrimination, namely, Johnson is a black women who applied for positions for which she was found to be qualified, but she was not selected for the positions, which were filled by two white men, Knott and Pawloski. *Alvarado*, 928 F.2d at 121.

■ The burden of production now shifts to the Postal Service to rebut this inference of discrimination by presenting legitimate nondiscriminatory reasons for its selections. The Postal Service has elected to rebut Johnson's *prima facie* case by showing that both Knott and Pawloski were selected for the Tour Superintendent, D.A. vacancies because they were better qualified than Johnson. *See Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1129 (4th Cir.1995) ("An employer may rebut a plaintiff's *prima facie* case by demonstrating that the person promoted was better qualified for the position."). The Court concludes that the Postal Service has satisfactorily made such a showing. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; *McNairn*, 929 F.2d at 978.

It is undisputed that Knott was well qualified, if not over-qualified, for the Tour Superintendent, D.A. position. Knott had served temporarily in the Wilmington Post Office as Manager, GMF, in March 1990. In late May 1990, Knott was promoted to the Eastern Regional Office in Philadelphia as Automation Advisor, EAS–23, reviewing the mail processing operations of postal facilities throughout the east coast. In September 1990, Knott sent a letter to James McDougald, then Postmaster for the Baltimore Post Office, requesting reassignment to Baltimore, in order to be home with his family. John Newman, Director of City Operations granted Knott's request because Knott was considered to be an expert in mail processing automation and to have a "strong background and operational experience." Def.'s Mem. Supp.Mot.Summ.J. Ex. 6. Knott's "reassignment" to Tour Superintendent, D.A. was, in essence, a "demotion," which he voluntarily accepted, from EAS–23 to EAS–19.

Pawloski had been a General Supervisor since July 1978, and had served temporarily as Tour Superintendent in the Baltimore Post Office from July 1989 to September 1989. From September 1989 to the date of the vacancy announcement, Pawloski had "performed very well" on numerous occasions as Tour Superintendent, D.A. in Balti-

more. Def.'s Mem.Supp.Mot.Summ.J. Ex. 22 at 97. Warren Glass ("Glass"), the selecting official for vacancy announcement # 60–90, testified that Pawloski "had a broad knowledge of all operations with the Postal Service, be it mechanized or manual." *Id.* at 95. Pawloski's extensive mail processing experience with other post offices and his technical skills enabled him to develop new mechanisms which made the Baltimore Post Office's mail processing operations more efficient. *Id.* at 89. In addition, Pawloski's demonstrated professionalism was a significant factor for his selection. Glass testified that Pawloski "had very good human relations skills" in his dealing with other supervisors, employees and union representatives, which was an important aspect of the duties of a Tour Superintendent, D.A. *Id.* 90–91.

The burden of production now shifts back to Johnson to show that the reasons articulated by the Postal Service are merely a pretext for race and sex discrimination. *Burdine,* 450 U.S. at 252, 101 S.Ct. at 1093. Johnson contends that, based on her relevant work experience, she was better qualified than Pawloski for the Tour Superintendent, D.A. position.[3] Johnson claims that she had "experience in a broader range of positions than did Pawloski." Pl.'s Mem.Opp'n Mot. Summ.J. at 12. Johnson, however, does not attempt to point to any specific experience(s) that makes her better qualified than Pawloski. Nor does Johnson provide the Court with any affidavits to support her claim that she is better qualified than Pawloski. *See Evans v. Technologies App. & Servs. Co.,* 875 F.Supp. 1115, 1120 ("[A]n employee's perceptions of her qualifications are irrelevant."), *aff'd,* 80 F.3d 954 (4th Cir.1996).

The fact that Johnson believes that she should have been selected for the vacancy, alone, does not support an inference of discrimination. It is well established that in discrimination cases, "a subjective belief of discrimination, however genuine, [cannot] be the basis of judicial relief." *Moore v. Reese,* 817 F.Supp. 1290, 1295 (D.Md.1993) (quoting *Elliott v. Group Med. & Surg. Serv.,* 714 F.2d 556, 557 (5th Cir.1983), *cert. denied sub nom. Elliott v. Group Hosp. Serv. Inc.,* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984)).

Despite Johnson's failure to carry her burden, the Postal Service has firmly established that Glass's selection of Pawloski was not based upon discriminatory animus against Johnson. The record shows that Glass selected Pawloski based on nondiscriminatory standards. For example, Pawloski had more years of supervisory experience than Johnson. Johnson became a General Supervisor in 1986, while, according to Glass, Pawloski "had been a supervisor probably 7, 8 years prior to being selected as general supervisor" in 1978. Def.'s Mem.Supp.Mot.Summ.J. Ex. 22 at 86. In addition, Pawloski had extensive experience in the Baltimore Post Office which was significantly larger and more complex than the Wilmington Post Office, where Johnson had gained her high level supervisory experience. Moreover, Johnson's experience in automation had been essentially outdated. Since she had gained her automation experience in 1986 and 1987, automation had become much more complex.

Glass also testified that Johnson needed improvement in her human relations skills. Apparently, Glass had received complaints from other supervisors, union representatives and employees about Johnson's "attitude" and use of profanity. On the other hand, Glass testified, and it has not been disputed, that Pawloski had excellent human relations skills and had the ability to handle tense situations in the post office. Furthermore, Glass testified that he had never seen Pawloski get upset or use profanity, and that Pawloski never had any complaints filed against him by other supervisors or union representatives. *Id.* at 86.

Johnson contends that Glass's reasons for selecting Pawlowski should not be readily accepted by the Court. Johnson argues that Glass's selection warrants "stricter scrutiny" because it was based on subjective criteria and not supported by a comparative analysis of all the candidates for the Tour Superin-

---

**3.** Johnson does not allege that she was better qualified than Knott. Such a concession reduces to "zero" the likelihood of Johnson proving that the Postal Service intentionally discriminated against her in selecting Knott for the Tour Superintendent, D.A. position.

tendent, D.A. vacancies. Glass testified that he could not explain why he had not prepared such an analysis, which is required under Postal Service regulations. Johnson therefore maintains that "[b]ecause of the absence of such an analysis, Glass's *post hoc* explanation of why he asserted that Eugene Pawloski's qualifications were superior to [Johnson]'s is unsupported by any contemporaneous documentation and [is] open to question." Pl.'s Mem.Opp'n Mot.Summ.J. at 14.

■ This argument fails to consider that use of subjective criteria is neither improper in the promotion selection process nor indicative of unlawful discrimination.[4] An employer can "properly take into account both the objective factor[s] ... [as well as] the more subjective factors like [the employee's] good interpersonal skills and [her] ability to lead a team." *Amirmokri,* 60 F.3d at 1130; *Mallory v. Booth Refrigeration Supply Co.,* 882 F.2d 908, 910 (4th Cir.1989). In the instant case, Glass not only used subjective criteria, but also used numerous objective criteria: years of supervisory duties; experience in mail processing; experience with the Baltimore Post Office operations; complaints filed against the candidate; and the use of profanity.

■ Next, Johnson alleges that the selection process "was marked by irregularity and disregard of procedure, owing to defendant's attempt to avoid selecting plaintiff." Compl. at ¶ 20. Johnson contends that the Postal Service failed to follow the relevant procedures that governed filling the two Tour Superintendent, D.A. vacancies. Johnson argues that Knott violated Postal Service procedures by not applying for the position during the application period and that his selection is tainted in that his candidacy was not considered by the selection committee or the designated selecting official. Johnson further argues that Pawlowski's selection

was also tainted in that it violated regulations because he had been detailed to the vacant Tour Superintendent, D.A. position for more than the allowable sixty-day limit. Neither of these allegations is sufficient to generate a dispute of material fact.

As for the manner in which Knott was selected, the Postal Service regulations plainly provide:

> The competitive procedures ... do not have to be followed when management initiates or an employee requests a reassignment to a position at the same grade or when an employee voluntarily accepts or requests, in writing, a potion at a lower grade.

Postal Service Handbook at § 543.2. Thus, Knott's selection was in accordance with Postal Service procedures.

■ Regarding Pawloski's selection, admittedly, the Postal Service regulations state that an individual who has been detailed to a vacant position for more than sixty days is ineligible for appointment to that position. *See* Postal Handbook § 544.822. According to the Postal Service, however, Pawlowski had only served in the position on "sporadic days when the actual Tour Superintendent D.A. took leave." Def.'s Reply Mem.Supp. Mot.Summ.J. at 4. Moreover, the Postal Service asserts that Pawlowski was relieved of his duties as Acting Tour Superintendent, D.A., in order to prevent any potential violations. Johnson does not dispute these assertions. The Court must therefore accept them as true and conclude that the Postal Service avoided any violations. However, even assuming that Johnson were able to generate a genuine dispute as to whether the Postal Service violated its regulations, violations of agency rules and regulations do not by themselves evidence discrimination. *See Kennedy v. Landon,* 598 F.2d 337, 341 (4th Cir.1979).[5] Thus, the Court concludes that

---

4. Although courts are sometimes weary of promotion decisions that are based solely on subjective criteria and unsupported by "objective" standards or "contemporaneous documentation," which is not the situation here, on summary judgment, the burden of proving that there exists a genuine factual dispute rests entirely on the non-moving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Here, Glass's reasons for

selecting Pawlowski are, of course, "open to question," but Johnson has not presented any significantly probative evidence undermining Glass's assertions of gender and racial neutrality in his decision-making.

5. Johnson has produced statistical evidence that females in the Postal Service, particularly in the Baltimore district, have difficulty in achieving

Johnson has failed to produce any evidence to rebut the Postal Service's legitimate reasons for her non-selection and that there is insufficient evidence of unlawful discrimination. Therefore, the Court shall grant summary judgment in favor of the Postal Service as to the disparate treatment failure-to-promote claim.

### b. Retaliatory Discrimination

Johnson has alleged that she was not promoted to the Tour Superintendent, D.A. position in retaliation for her prior EEO filings against David Alexander ("Alexander"), her former supervisor and a close friend of Glass, the selecting official for vacancy # 60–90. In 1988, Johnson had filed two complaints of discrimination against Alexander, involving a letter of warning and a merit evaluation rating. The complaints were settled in Johnson's favor: the warning letter was withdrawn and her merit evaluation rating was changed from "Good" to "Very Good." ·.

■ To prevail on a retaliation claim, Johnson must "follow the same sequence of proof that she was required to follow in her discrimination claim." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989). In order to make out a *primà facie* case of retaliatory discrimination, Johnson· must show:

> (1) that [s]he engaged in protected activity; (2) that [her] employer took adverse employment action against [her]; and (3) that there was a sufficient causal connection between the protected activity and the adverse employment action.

*Hopkins v. Baltimore Gas & Elec. Co.*, 871 F.Supp. 822, 836 (D.Md.1994).

promotions· to management positions. Johnson argues that the dearth of females in management is indicative of intentional discrimination. Although statistical evidence is "unquestionably relevant" in Title VII cases, the probative value of the evidence presented here is minimal, at best, without a relevant comparison between the percentage of female employees and the percentage of potential female applicants in the qualified labor pool. *Carter v. Ball*, 33 F.3d 450, 456–57 (4th Cir.1994). Johnson has failed to make the relevant comparison. Also, Johnson has failed to establish the relevance of the statistics to the position involved in this dispute.

■ Johnson clearly has satisfied the first two elements. The dispute here, however, centers around causation, the third element of the *prima facie* case. Johnson argues that there is a sufficient causal connection between her past EEO activity and her non-selection for promotion because Glass had knowledge of the EEO complaints that she filed against Alexander in 1988. According to Johnson, Alexander told her that he had, a conversation with Glass, during which he told Glass to be careful of EEO claims arising out of employees' merit evaluations. Although Glass has denied having any knowledge of Johnson's prior EEO activity, Johnson contends Glass's testimony is "inconsistent and less than credible." Pl.'s Mem.Opp'n Mot. Summ.J. at 16. Johnson argues that because Glass worked closely with Alexander, and because Glass admitted that he and Alexander had discussed EEO charges, "Glass's claim that he and Alexander studiously avoided any discussion of Ms. Johnson's charges [is] artificial ad unconvincing." *Id.* Johnson, moreover, argues that "this avoidance is all the more unnatural," in light of an internal Postal Service memorandum encouraging supervisors of aggrieved employees to go through the chain of command, in an effort to resolve all complaints during the informal stages of the EEO process.

The Court is compelled to conclude that Johnson has failed to generate a genuine dispute of material fact. Johnson's retaliation claim is based upon speculation and unsupported inferences. It is not reasonable to infer from Johnson's deposition testimony that Alexander specifically told Glass about Johnson's prior EEO activity.[6] Even assum-

6. Johnson contends that a fair reading of her deposition testimony reveals that Alexander told her "that he had discussed her EEO charges with Glass in the context of a discussion about avoiding them." Pl.'s Mem. Opp'n Mot.Summ.J. at 16. The Court disagrees. Johnson's deposition testimony reveals:

> Q  Did David Alexander, did he say that he told, told Warren Glass, told Warren Glass that, that you, in fact, filed the EEO complaint?
> A  Because of what happened with me, he told him to watch the—evaluation.

ing that the Court made such an inference, Johnson's testimony is nevertheless inadmissible hearsay evidence, which, as a matter of law, cannot create a factual dispute. *See* Fed.R.Civ.P. 56(e); *Greensboro Prof. Fire Fighters v. Greensboro*, 64 F.3d 962, 967 (4th Cir.1995).

Additionally, the internal Postal Service memorandum, which merely outlined a new procedure for the resolution of EEO complaints, does not support the inference that Alexander discussed Johnson's EEO filings with Glass. The memorandum was issued on July 1, 1991, nearly one year *after* the underlying, allegedly discriminatory, non-selection occurred. Although at the summary judgment stage of litigation, the Court must view all the facts and reasonable inferences in the light most favorable to the nonmovant, *see Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986), here, Johnson "cannot create [a] genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985); *see also Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365, n. 9 (4th Cir.1985) ("If the employer did not know of the protected activity a causal connection to the adverse action cannot be established.").

In any event, assuming that the Glass knew about Johnson's prior EEO activity, "mere knowledge on part of an employer that an employee ... has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for adverse personnel actions against the employee." *Carter*, 33 F.3d at 460.

Q  All right, ma'am. Now, you've got to tell me, are you saying—did, did David Alexander say that he told Warren Glass that you, Peggy Johnson, had filed EEO complaints?
A  That was not his statement.
Q  Okay. Is there any other, any other—other than that conversation, is there any other evidence you have that Warren Glass was aware of the EEO complaints that you filed there?
A  I don't think so.
Def.'s Mem.Supp.Mot.Summ.J. Ex. 29 at 66.

7. Assuming Johnson made out a *prima facie* case, her claim would still fail because she has not presented any evidence to rebut the nondiscrimi-

Johnson argues that Glass's assertion that he did not retaliate against her in November 1990 is undermined by the employment action he took against Johnson in retaliation for the instant claim. Apparently, when Johnson returned to work after the administrative hearings related to this case, Glass removed her from Absence Control and assigned her to a "less desirable position." Relying on Fed.R.Evid. 404(b), Johnson argues that "Glass's blatant retaliation against [Johnson] for naming him as an alleged discriminating official helps to show his intent in the instance [sic] at issue here and to impeach his denial of intent to retaliate against [Johnson]." Pl.'s Mem.Opp'n Mot.Summ.J. at 17. This argument is without merit.

It is unreasonable to infer that Glass's conduct in April 1994 is significantly probative of his intent in November 1990. Such a weak inference is purely speculative and is unsupported by the record in this case. Johnson has neither alleged nor attempted to prove that her transfer to a "less desirable position" was an "adverse employment action" which would constitute an unlawful retaliatory act. *See Caussade v. Brown*, 924 F.Supp. 693 (D.Md.1996). Accordingly, for the reasons set forth above, the Court concludes that Johnson has failed to establish a *prima facie* case of retaliatory discrimination.[7]

## 2. Second Claim: Sexual Harassment

Johnson's second cause of action is based on allegations that, in 1990 and 1991, Knott subjected her to sexual harassment, "resulting in false and improper evaluations and recommendations."[8]

natory reasons presented by the Postal Service for her non-selection. *See supra* pp. 582–84; *Ross*, 759 F.2d at 365–366.

8. In her Complaint, Johnson alleged sex discrimination *and* sexual harassment. However, Johnson did not allege sex discrimination in her EEO complaint. Indeed, the administrative law judge noted that Johnson "was not alleging that she was treated differently because of her sex but rather that she was subjected to unlawful sexual harassment." Def.'s Mem.Supp.Mot.Summ.J. Ex. 20 at 3. Additionally, in her memorandum in opposition to the motion for summary judgment, Johnson does not dispute the Postal Service's contention that the sexual discrimination

In February 1990, Johnson was assigned to the Wilmington Post Office as the Acting Tour Superintendent. One month later, Knott was promoted to Manager, GMF of the Wilmington branch. Johnson contends that, during their mutual stay in Wilmington, Knott made numerous "comments and remarks of a lewd, offensive and suggestive nature . . . and made veiled advances." Compl. at ¶ 27. Johnson alleged that on one occasion Knott asked her whether she was dating Earl Lang ("Lang"), another Baltimore postal employee detailed to the Wilmington Post Office. Knott then remarked that if Johnson was not dating Lang, she might as well be with Knott. On another occasion, Knott told Johnson: "you sure ought to try this," and "this is probably the best thing you ever had." Johnson claims that these comments—"this"—referred to sex with Knott.

Johnson also alleged that, on one evening, Knott walked her to the door of her residence and stood so close to her that he made her stomach upset. As a result of this incident, Johnson claims that she had to make arrangements to move into another hotel building. On the day she was moving, Knott allegedly knocked on her door and quipped that because Johnson's hotel room had two beds she should let Lang stay with her and save the Postal Service money. On another day, Knott suggested that Johnson should come to see his new apartment. Finally, when Knott found out that he had been promoted to EAS 23, Knott kissed Johnson on the lips. Johnson claims that she did not express her displeasure with Knott's conduct because she was afraid of reprisal.

In January 1991, Johnson returned to the Baltimore Post Office as General Supervisor and was again under Knott's direct supervision. Knott had been reassigned to the Baltimore Post Office as Tour Superintendent, D.A. in September 1990. According to John-

son, Knott continued "his pattern of remarks and comments, and also subjected [her] to unwelcome contact." Compl. at ¶ 28. For example, while talking to Johnson on the work floor, Knott would put his arms around her shoulders, and on occasion, around Johnson's waist. Other times, Knott would stand so close to Johnson that she would feel "uncomfortable."

An incident which occurred in Spring 1991 is the focus of Johnson's sexual harassment claim. In April or May 1991, a short time after the second of Johnson's sisters died, Knott allegedly initiated a conversation with Johnson about her deceased sisters in an effort to make Johnson cry. Once Johnson started crying, in an insincere gesture to console her, Knott tried to embrace Johnson, presumably to effect physical contact of a sexual nature with her. Johnson contends that she pushed Knott away and told him that his conduct was offensive and unprofessional. Johnson claims that after this incident, "a nightmare" began. Knott began a "campaign of harassment," singling Johnson out for criticism and treating her differently from his other subordinates. Compl. at ¶ 29. On a daily basis, Knott would send Johnson numerous (sometimes, seven or eight) written communications criticizing her work performance and would repeatedly harass Johnson over the walkie talkie. Pl.'s Mem.Opp'n Mot.Summ.J. Ex. 41 at 83–96.

Johnson also claims that, as part of Knott's harassment campaign, in August 1991, he gave her a rating of "Good" on her performance evaluation for fiscal year 1991. Johnson believes that she deserved a rating of "Outstanding," a rating she had never received in her career at the Postal Service. In November 1991, Knott continued his harassment campaign by writing an unfavorable recommendation in connection with Johnson's application for a position in Arlington, Virginia.[9]

claim is not properly before the Court. Therefore, the Court shall dismiss without prejudice the sex discrimination claim for failure to exhaust administrative remedies. *See Nealon v. Stone,* 958 F.2d 584, 589–90 (4th Cir.1992).

**9.** Defendant argues that this particular allegation is not properly before the Court because when

Johnson initiated the EEO process she did not allege that the unfavorable recommendation was a result of sexual harassment. Johnson had only alleged race discrimination in connection with this allegation. Although that appears to have been the case, for reasons that are unclear, a claim for sexual harassment in connection with the unfavorable recommendation was addressed

As a result of Knott's alleged sexual harassment, Johnson claims that she has suffered traumatic shock and injury to her nervous system, causing emotional distress, loss of appetite, and skin rashes. She seeks declaratory and injunctive relief, and urges the Court to issue an order compelling the correction of her merit evaluation rating.

It is well settled that a case of unlawful sexual harassment may be established by demonstrating either that continued employment was conditioned on sexual favors ("*quid pro quo* sexual harassment"), or that, while no economic benefits were affected, the employee was subjected to a hostile or abusive work environment ("hostile work environment"). *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986); *Carrero v. New York City Hous. Auth.,* 890 F.2d 569, 579 (2d Cir.1989). Here, Johnson has attempted to establish unlawful sexual harassment under the *quid pro quo* theory. *See* Pl.'s Mem.Opp'n Mot.Summ.J. at 23 n. 23.

■■ In order to make out a prima facie case of *quid pro quo* sexual harassment, following the *McDonnell Douglas* proof scheme, Johnson must establish that

1. [She] belongs to a protected group.

2. [She] was subject to unwelcome sexual harassment.

3. The harassment complained of was based upon sex.

4. [Johnson's] reaction to the harassment affected tangible aspects of [her] compensation, terms, conditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability. Further, as in typical disparate treatment cases, [Johnson] must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the [Postal Service]'s use of a prohibited criterion in making the employment decision.

5. The [Postal Service] ... knew or should have known of the harassment and took no effective remedial action.

*Spencer v. General Elec. Co.,* 894 F.2d 651, 658 (4th Cir.1990).

■■ "The gravamen of a *quid pro quo* claim is [the fourth element of the *prima facie* case, which requires] that a tangible job benefit or privilege is conditioned on an employee's submission to sexual black-mail and *that adverse consequences follow from the employee's refusal.*" *Gary v. Long,* 59 F.3d 1391, 1395 (D.C.Cir.1995) (quoting *Carrero v. New York City Hous. Authority,* 890 F.2d 569, 579 (2d Cir.1989)) (emphasis added). Here, Johnson has failed to satisfy that element of the *prima facie* case; specifically, Johnson cannot show that her rejection of Knott's sexual advances in April or May 1991 was the *cause* of an evaluation other than "Outstanding" and of the unfavorable recommendation.[10] *Id.*

The record shows that Knott was critical of Johnson's performance prior to Johnson's rejection of his advances. Indeed, Johnson's testimony reveals that her problems with Knott started the morning she came back to work in Baltimore on January 28, 1991. Def.'s Mem.Supp.Mot.Summ.J. Ex. 29 at 133. Johnson testified that on her first day back, Knott refused to tell her "good morning" and had a "real negative attitude" toward her. Later that day, Johnson testified, "it went from him hollering at me over the walkie talkie to me turning the walkie talkie off." *Id.* Ex. 28 at 71. Johnson also testified that, in March 1991, Knott sent her numerous handwritten notes complaining about her work performance. During the same month, Knott (mistakenly) criticized her for not attending to work at a time when she was scheduled for a training class. At a latter date, Knott allegedly criticized Johnson for not knowing about a project in an area for

---

on the merits at the administrative hearing. *See* Def.'s Mem.Supp.Mot.Summ.J. Ex. 20 at 34–36. Therefore, the Court will address it here.

**10.** The Postal Service disputes whether Johnson has proved elements two and three, namely, whether Johnson was subject to *unwelcome* sexu-

al harassment and whether the harassment complained of was *based on sex.* For the purposes of the motion for summary judgment, the Court will credit Johnson's assertions that Knott's conduct was unwelcome and that the alleged harassment was based on her being female.

which she was not responsible. All of these acts predate Johnson's rejection of Knott's sexual advances in April or May 1991. Hence, Johnson cannot demonstrate that her rejection of Knott's sexual advances resulted in a marked change in his conduct or in tangible job detriments that did not exist before the rejection.

■ Regardless of whether Johnson could establish a *prima facie* case, the Postal Service has articulated legitimate reasons for the evaluation and the recommendation. As to the August 1991 evaluation, Johnson had spent the first half of the rating period in the Wilmington Post Office and the second half in Baltimore. Knott testified that he spoke to Johnson's supervisor in Wilmington and based on that conversation he gave her a rating of "Very Good" for the first half of the rating period. For the second half in Baltimore, Knott personally gave Johnson a "Satisfactory" rating. He then averaged the two ratings and arrived at a "Good" rating for the entire evaluation period.

Knott has fully explained his reasons for finding Johnson's performance merely "Satisfactory" during the second half of the rating period, and for writing Johnson an unfavorable recommendation in November 1991. Knott testified that Johnson missed several deadlines and "suspense dates"; had a consistent problem with overusing employees as "higher levels"; failed to schedule employees to cover different shifts and responsibilities; failed to monitor sick leave of her subordinates; failed to submit necessary paperwork for employee evaluations; and failed to use a particular employee with whom the Postal Service had entered into an EEO settlement. In addition, on several occasions, employees in the tour that followed Johnson would refuse to "sign off" because Johnson's work area was not properly maintained. Finally, Johnson's failure to follow instructions resulted in the issuance of three letters of warning between June and October 1991.

These legitimate, nondiscriminatory reasons for the satisfactory evaluation and the unfavorable recommendation are not in dispute.[11] Therefore, as a matter of law, Johnson has not generated a genuine dispute of material fact as to whether she was a victim of unlawful sexual harassment. Accordingly, summary judgment shall be granted in favor of the Postal Service.

### 3. Third Claim: Retaliation

■ Johnson's third cause of action is based on the allegation that she received an "inaccurate and undeserved rating of 'Good' on her performance evaluation in 1992," in retaliation for her prior EEO activity. Compl. at ¶ 37.

During the period between August 1991 and August 1992 ("FY 1992"), Johnson was General Supervisor of Tour 2 at the Baltimore Post Office. For the first two months of FY 1992, Knott was Johnson's direct supervisor. Upon Knott's reassignment to the Incoming Mail Facility ("IMF"), Joseph Wells, another Tour Superintendent, D.A., became Johnson's supervisor. Wells prepared Johnson's FY 1992 performance evaluation, which is the subject of this cause of action.

Johnson claims that her performance during FY 1992 was superior and warranted a rating of at least "Very Good." Compl. at ¶ 40. Instead, Wells gave her a "Good" rating, without providing any comments or explanations for the rating. Johnson argues that she received such a rating because Wells was aware of the numerous EEO complaints she had filed against Knott, and that Knott, fueled with revenge attributable to the sexual harassment charges pending against him, had "affected" the evaluation process. The Postal Service, however, argues that Wells had no knowledge of Johnson's prior EEO complaints and that Knott and Wells discussed only Johnson's performance goals. Knott testified that he did not have discus-

---

**11.** Johnson makes much of the fact that in May 1991 Knott recommended her for a Tour Superintendent position in Northern Virginia. Johnson's reliance, however, is misplaced. Knott has testified that the May recommendation was based primarily on Johnson's work performance in Wilmington, not in Baltimore. Moreover, the May 1991 recommendation undercuts the strength of the inference of gender-based animus on the part of Knott.

sions with Wells about Johnson's 1992 evaluation rating.

Johnson testified that she had several conversations with Wells, during which he advised her that she should refrain from filing any more discrimination complaints because it would be detrimental to her career with the Postal Service. This testimony is supported by Johnson's September 19, 1991, letter to Wells referencing their discussion on September 11. Pl.'s Mem.Opp'n Mot. Summ.J. Ex. 29. Viewing the facts and inferences in the light most favorable to Johnson, the Court concludes that there is sufficient evidence to prove that Wells was aware of Johnson's prior EEO activity.

Despite this conclusion, however, Johnson's retaliation claim fails because, as a matter of law, Wells's knowledge of her prior EEO activity, alone, is insufficient to establish retaliatory discrimination. *See Carter,* 33 F.3d at 460. Wells's lack of retaliatory intent is strongly corroborated by the fact that all of the general supervisors evaluated by him in 1992 were given ratings of "Good." Def.'s Mem.Supp.Mot.Summ.J. Ex. 33.

Johnson's allegation that Knott actually contributed to the evaluation and that he had a continued interest in her work performance after his reassignment to IMF does not preclude summary judgment. Johnson argues that a January 7, 1992, memorandum Knott sent to Ron Wileman, Manager, GMF, discussing problems with Johnson's work performance, proves that *Knott* had retaliatory intent. Contrary to Johnson's argument, however, the memorandum does not suggest that Knott had an interest in her work performance while he was assigned to IMF. Rather, the memorandum merely summarizes the disciplinary actions Knott took against Johnson during the months of October and November 1991. Pl.'s Mem.Opp'n Mot.Summ.J. Ex. 31. The most plausible inference to be drawn from this memorandum is that despite Knott's new assignment, he was consumed with the pending discrimi-

nation charges. The memorandum demonstrates that Knott was in the process of gathering information for his defense and to resurrect his image. The memorandum contains no suggestion of a retaliatory intent, and certainly none attributable to Wells.[12] Therefore, the Court shall grant the Postal Service summary judgment as to this retaliatory claim.

### 4. Fourth Claim: Denial of Promotional Training

■ In her fourth cause of action, Johnson alleges that, in February 1993, she was not selected for the Management Progression Program (the "Management Program") in retaliation for her prior EEO activity.

The Management Program was developed by the Postal Service to facilitate the search for qualified applicants to fill managerial vacancies within the Postal Service and to provide a career path for employees affected by the Postal Service's restructuring plan, which eliminated mid-level employees like General Supervisors. Pl.'s Mem.Opp'n Mot.Summ.J. Ex. 33. Individuals selected for the Management Program would be initially placed at EAS–20 and upon successfully completing the program, they would be promoted to EAS 22 and eventually to EAS–24. *See* Pl.'s Mem.Opp'n Mot.Summ.J. Ex. 40 at 33.

In February 1993, Peter Bernard ("Bernard"), Plant Manager, Processing and Distribution, distributed a memorandum to former General Supervisors (EAS–17) notifying them that five Manager, Distribution Operations (EAS–24) vacancies would be filled through the Management Program. Twelve candidates were interviewed and rated by a committee. The committee forwarded to Bernard a list of the seven best qualified applicants, which included Johnson. During Bernard's deliberation, he "got bits and pieces" of information from Knott and several other high level supervisory personnel. Bernard ultimately selected five individuals, but did not select Johnson.[13]

---

12. Likewise, the November 9, 1992, memorandum Knott circulated to supervisors under his direction, does not suggest, as Johnson argues, that Knott would retaliate against his subordinates for filing EEO complaints. The memo-

randum merely encourages employees under Knott's supervision to work as a team and to respect the chain of command.

13. Bernard selected two black males, two black females and one white male: Tom Leeper, Terry

Johnson contends that a concerted effort was made to exclude her from the Management Program. Johnson alleges that she was not selected because Knott had told Bernard that she was a "trouble maker." This allegation is supported only by the affidavit of John C. Holmes ("Holmes"), an acting General Supervisor in the Baltimore Post Office. Holmes previously had testified, at the administrative hearing on April 13, 1994, that he did not recall overhearing a conversation between Knott and Glass about Johnson. Def.'s Mem.Supp.Mot.Summ.J. Ex. 31 at 47–48. Now, nearly two years later, Holmes has provided an affidavit, claiming that in October 1992 he overheard Glass ask Knott why Johnson had not been temporarily assigned as an acting Tour Superintendent. Knott allegedly responded that he had shown Bernard "all of the EEOs that Ms. Johnson had filed." Pl.'s Mem.Opp'n Mot.Summ.J. Ex. 51.

The Court is now faced with these conflicting accounts. Under similar circumstances, the Fourth Circuit held:

> If a [witness] who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the [witness]'s testimony is correct.

*Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984) (quoting *Perma Research and Dev. Co. v. Singer*, 410 F.2d 572, 578 (2d Cir.1969)). Accordingly, this Court shall disregard Holmes' administrative hearing testimony and his affidavit. *See Harrison v. Edison Bros. Apparel Stores, Inc.*, 814 F.Supp. 457, 467 (M.D.N.C.1993).

Johnson is left with the unsupported allegation that she was better qualified than the selected candidates because she had one of the highest qualification ratings. The record

reveals that the selected candidates received the same qualification rating or higher.[14] Thus, Johnson is again left with her own perception of her qualifications, which does not provide support for her claim. *See Evans*, 875 F.Supp. at 1120. As a matter of law, Johnson is unable to establish a *prima facie* case of retaliatory discrimination.

▉ Bernard nevertheless has provided nondiscriminatory reasons for his selections: (1) Patricia Burton was the only EAS–18 recommended to Bernard and therefore her promotion to EAS–20 was considered to be economical (and in addition, she had experience as supervisor of the registry section of the post office, which was an isolated, distinct operation); (2) Tom Leeper and Terry Powers were from Tour 3, where most of the mail comes through the Post Office (Bernard wanted individuals with this kind experience); (3) Beverly Wade had a broad array of experience on almost every tour and specifically Tour 1 where, as Bernard described it, "the [mail] race ends" (and in addition, Wade's experience was well-suited to supervision of the "remote bar coding system"); and (4) Earl Lang had experience as "remote bar coding" coordinator and had excellent mail processing experience.

Johnson has not even attempted to show that these proffered reasons are pretextual for intentional, retaliatory discrimination. Accordingly, the Court shall grant the Postal Service summary judgment as to this claim.

## V. CONCLUSION

The Court is indeed sensitive to Johnson's concern that the "covert" nature of much employment discrimination not be allowed to obscure the validity of substantial claims. Nevertheless, for the reasons set forth, the Court is constrained to the view that no reasonable juror could reasonably find the facts in favor of Johnson on any of her claims, in light of the substantive and procedural standards indisputably applicable in this case. Accordingly, for the reasons set forth herein, and by separate order entered

---

Powers, Patricia Burton, Beverly Wade, and Earl Lang.

14. Peggy Johnson–22; Earl Lang –24; Patricia Burton–23; Tom Leeper–22; Terry Powers–22; Beverly Wade–2?. *See* Pl.'s Mem.Opp'n Mot. Summ.J. Ex. 35.

herewith, the defendant's motion for summary judgment shall be granted as to all claims.